# EXHIBIT A

Filed
D.C. Superior Court
10/28/2020 15:81PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

**HIRECounsel DC, LLC**
1220 K Street, N.W., Suite 400
Washington, D.C.  20006

**Plaintiff,**

v.

**KILIAN CONNOLLY**
10 Brooks Court
Boston, MA  01950

**Defendant.**

**Case No.** 2020 CA 004508 B

## COMPLAINT

Plaintiff HIRECounsel DC, LLC ("Plaintiff" or "the Company"), by undersigned counsel, files this Complaint against Defendant Kilian Connolly ("Defendant" or "Connolly").  This is an action for damages and for injunctive relief due to Connolly's violation of his post-employment contractual obligations in his Employment Agreement with the Company as well as for his violation of the District of Columbia Uniform Trade Secrets Act, DC Code §§ 36-401 et seq., by wrongfully misappropriating by improper means a confidential report prepared by the Company's Vice-President of Sales regarding on-going customer placements, price mark-ups, and revenue projections.

### I.     PARTIES

1.     HIRECounsel DC, LLC is a District of Columbia limited liability corporation whose headquarters and principal place of business is located in Chicago, Illinois.

2.     Defendant Connolly lives at 10 Brooks Court, Boston, Massachusetts; he is a citizen of Massachusetts.

1

## II.   JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction under D.C. Code Ann. § 11-921. Personal

jurisdiction and venue are proper under D.C. Code Ann. § 13-422, pursuant to the parties' express

written consent in the January 26, 2015 Employment Agreement between the Company and

Connolly.  See attached Exhibit A, Employment Agreement, pp. 13-14 ("The parties consent to

the exclusive jurisdiction of the Superior Court of the District of Columbia … for all purposes in

connection with any legal proceeding resulting from any beach or anticipated breach of Section 4

or 5 by the Employee.").

## III.   FACTS COMMON TO ALL COUNTS IN THE COMPLAINT

4.     The Company is a legal staffing and managed document review company.  The

Company provides law firms and corporate legal departments permanent and temporary legal

placements of attorneys and paralegals as well as supplies personnel, technology, and staff to

support managed document review for transactions and litigation matters.

5.     Relevant to this case, the Company provides services to law firms and corporate

legal departments in markets throughout the United States, including, but not limited to,

Washington, DC, and Boston, Massachusetts, where it has offices.

## IV.   DEFENDANT KILIAN CONNOLLY'S EMPLOYMENT AGREEMENT

6.     In January 26, 2015, the Company hired Connolly as a Managing Director of Client

Relations.  The parties entered into an Employment Agreement that provided, in pertinent part,

that as a Managing Director of Client Relations, Connolly was responsible for:

> (i) marketing the services of the COMPANY to clients and potential clients in the
> Territory, which may include preparing proposals and pitching business; (ii)
> soliciting, obtaining business from and providing services to employer-clients in
> the Territory needing temporary paralegals, attorneys and legal support staff,
> including, but not limited to coders; (iii)  developing and maintaining relationships
> with employer-clients in the Territory, which may include coordinating meetings

2

with clients and potential clients to explore potential new business and follow-up on existing business; (iv)  fostering good relations with clients in the Territory;  (v) supervising the COMPANY'S job posting process with respect to open assignments that are potentially commissionable to EMPLOYEE in accordance with Exhibit A; (vi)  recruiting, soliciting and providing services to employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to, coders; (vii)  recruiting, soliciting, interviewing and referring job candidates to employer-clients in the Territory; (viii)  effecting the placement of job candidates with employer-clients in the Territory, which may include handling details and arrangements with respect to leased project work space, coordination of information technology issues and acting as a liaison between recruiters and clients; and (ix)  engaging in such other duties and responsibilities as are consistent with the foregoing or assigned by the President of the Managing Member of the COMPANY … or the Chief Operating Officer of the Managing Member of the Company … .

See attached Exhibit A, Employment Agreement, pp. 1-2.

7.     The Employment Agreement defined the "Territory" as "Boston, MA and the general surrounding areas," but also stated:  "In addition Employee may conduct targeted marketing in Washington, DC and New York City … ."  See attached Exhibit A, Employment Agreement, p. 2.

8.     Connolly was based in the Company's Boston office, but on several occasions in 2019, he was also directly responsible for customer engagements pertaining to managed document review projects in Washington, DC for which he received compensation.

9.     Fundamental to Connolly's position as a Managing Director of Client Relations was his access to information that is confidential and constitute trade secrets of the Company.  This included detailed confidential information regarding Company legal placements and prospects as well as the strengths and weaknesses of candidates for temporary and permanent legal placements at customers.   This also included confidential information concerning customers and the Company's relationships with them; pricing and other terms of contractual agreements with these customers; and profitability concerning services to its customers.

3

10.     In exchange for the valuable consideration set forth in the Employment Agreement, including but not limited to compensation and benefits, acquisition of, and enhancement of his professional skills and experience, as well as access to confidential and trade secret information of the Company, Connolly acknowledged and agreed to be bound by the terms of an Employment Agreement.  See Exhibit A, Employment Agreement.  Section 4 of the Employment Agreement entitled "Confidential and Trade Secrets" provides, in pertinent, as follows:

> (b)   During and after EMPLOYEE'S employment with the COMPANY, the EMPLOYEE agrees that EMPLOYEE will not use, disclose, copy or retain or remove from the COMPANY'S premises any confidential or proprietary information or trade secrets, including but not limited to, lists and information pertaining to clients and client contacts, job applicants, referrals, and employees, and any other ideas, methods, procedures, techniques, written material, and other know-how, developed or used in connection with the COMPANY'S or any of its Affiliates' business belonging to the COMPANY or any of its Affiliates (collectively, "Confidential Information"), other than for use in connection with authorized work performed for the COMPANY or such Affiliates.  Confidential Information shall also include, but not be limited to, … financial and other information of the COMPANY and its Affiliates, not generally available to others.

See Exhibit A, p. 4-5.

11.     Section 5 of the Employment Agreement entitled "Non-Competition" provides, in pertinent part, as follows:

> (a) EMPLOYEE agrees that during the term of this Agreement and for a period of twelve (12) months following EMPLOYEE ceasing to be an employee of the COMPANY, EMPLOYEE will not, without the prior written consent of the COMPANY, either directly or indirectly, on EMPLOYEE'S own behalf or in the service or on behalf of others:
>
> > ***
> >
> > (vii) directly or indirectly … be employed by … any Competing Business within seventy-five (75) miles of any office of the COMPANY or any of the COMPANY'S Affiliates, at which the EMPLOYEE is or was employed, performed services or engaged or assisted in the business or operations of the COMPANY or any of its Affiliates;
> >
> > ****

4

See Exhibit A, p. 6-7.  The term "Competing Business" is defined in Section 5(a)(i) of the Agreement as a "business which is either engaged permanent or temporary placement or the same or substantially the same business of the Company."  See Exhibit A, p. 6.

12.     Connolly also agreed, through Section 5(c) of the Employment Agreement, that "each of EMPLOYEE'S agreements set forth herein in the Agreement is reasonable and necessary to protect and preserve the business, interests, and properties of the COMPANY … ."  See Exhibit A, p. 8.

13.     On August 7, 2020, Connolly unexpectedly resigned his position as Managing Director of Client Relations effective that day.  See Exhibit B, Kilian Connolly's Resignation E-mail.  In his resignation e-mail, Connolly did not indicate he had taken a position with a new employer.

14.     Several weeks after his resignation, the Company in September 2020 learned that Connolly had joined Beacon Hill Staffing, LLC ("Beacon Hill") in its Boston office in its legal staffing specialty division as a Senior Account Executive.  Beacon Hill, through its legal specialty division, provides legal placement and managed document review services similar to the Company and is a competitor of the Company.

15.     Around the same time, the Company also learned that prior to his resignation, Connolly, on July 28, 2020, without permission from the Company, wrongfully forwarded from his work e-mail address to his personal e-mail a confidential internal report prepared by the Company's Vice-President of Sales regarding on-going placements, price mark-ups, and revenue projections by sales person.  This information was not available to the public, was created by the Vice President of Sales for internal use, only drawn from data in a password protected confidential database, was used by the Vice President of Sales to manage and direct her direct reports such as

Connolly, and displayed by her during a virtual meeting on July 28, 2020 with her direct reports like Connolly by only sharing her computer screen, and was marked "confidential and proprietary." Connolly misappropriated this highly confidential information by an improper means by taking a screen shot with a snipping tool and then forwarding that image to his personal e-mail account.

16.     On September 23, 2020, counsel for the Company sent Connolly a cease and desist letter, which stated in part as follows:

> HIRECounsel was very surprised and concerned to learn recently that you are now employed as a Senior Account Executive with its competitor, Beacon Hill Staffing Group ("BHSG"), in its legal specialty division, providing the same legal staffing and document review services you provided as an employee of HIRECounsel within 75 miles of HIRECounsel's Boston office, where you formerly worked. As you know, BHSG, and, in particular, its legal specialty division, is (like HIRECounsel) a professional staffing company that provides permanent and temporary staffing services, including the placement of attorneys, paralegals, legal support staff, and document review services. As such, BHSG is in direct competition with HIRECounsel. Also, as a BHSG Senior Account Executive, you are based in Boston. Thus, there is no question that your employment with BHSG in Boston falls directly within the scope of businesses for whom, under the plain terms of your Agreement, you may not perform legal staffing and document review services during the twelve-month Restricted Period. In addition, the highly sensitive Confidential Information that you have acquired and been exposed to in connection with your employment with HIRECounsel, and that you are required by your Agreement not only to protect but also to refrain from using or disclosing, relates directly to the highly competitive markets in which both BHSG and HIRECounsel operate.

> Our surprise and concern have been heightened by our recent discovery that, shortly before you resigned from your employment with HIRECounsel, you sent some of the Company's most highly sensitive and confidential proprietary information from your Company account to your personal e-mail address. You had no legitimate business reason connected with your work to send that information to your personal e-mail address, and by doing so you violated Section 4(b) of the Agreement, in which you agreed that you would not "remove from the C[ompany's] premises any confidential or proprietary information or trade secrets"; and by failing to return that information to the Company upon the termination of your employment, you violated Agreement Section 4(c).

See Exhibit C, Murphy September 23, 2020 Letter to Connolly.

17.     On September 29, 2020, the Company, through counsel, wrote Beacon Hill, forwarding a copy of the Company's Employment Agreement with Connolly and noting that Connolly's employment with Beacon Hill, and his misappropriation of the Company's confidential information, constituted violations of the terms of Connolly's Employment Agreement.   See Exhibit D, Murphy September 29, 2020 Letter to Beacon Hill.

18.     On October 9, 2020, Connolly, through counsel, responded to the cease and desist letter and refused to comply with his contractual obligations.

19.     As of the filing of this Complaint, Connolly remains employed by Beacon Hill in its legal staffing specialty division in Boston and has retained the Company's confidential information.

## COUNT I – BREACH OF CONTRACT OF SECTION 5 OF THE AGREEMENT

20.     The allegations contained in Paragraphs 1 – 19 of the Complaint are incorporated herein by reference.

21.     As outlined above, since leaving his position with the Company, Connolly has engaged in conduct that violates Section 5(a)(vii) of his Employment Agreement.

22.     Connolly is employed by a competing business, Beacon Hill's legal staffing specialty division, within seventy-five (75) miles of his former Boston office of the Company and is directly competing against the Company in the same territory that he serviced for the Company.

23.     Connolly's wrongful conduct and breach of his contractual obligations entitle the Company to compensatory damages, including but not limited to liquidated damages set forth in Section 5(e) of the Employment Agreement.

## COUNT II – BREACH OF CONTRACT OF SECTION 4 OF THE AGREEMENT

24.     The allegations contained in Paragraphs 1 – 19 of the Complaint are incorporated herein by reference.

25.     As outlined above, Connolly has engaged in conduct that violates Section 4(b) of his Employment Agreement.

26.     On July 28, 2020, without permission from the Company, Connolly forwarded from his work e-mail address to his personal e-mail a confidential report prepared by the Company's Vice-President of Sales regarding on-going placements, price mark-ups, and revenue projections by sales person.

27.     This information was not available to the public, was created by the Vice President of Sales for internal use only, drawn from data in a password protected confidential database, was used by the Vice President of Sales to manage and direct her direct reports such as Connolly, and displayed by her during a virtual meeting on July 28, 2020, by only sharing her computer screen, and was marked "confidential and proprietary."  Connolly misappropriated this highly confidential information by an improper means by taking a screen shot with a snipping tool and then forwarding that image to his personal e-mail account.

28.     Connolly's wrongful conduct and breach of his contractual obligations entitle the Company to compensatory damages, including but not limited to liquidated damages set forth in Section 5(e) of the Employment Agreement.

## COUNT III – VIOLATION OF THE DC UNIFORM TRADE SECRETS ACT

29.     The allegations contained in Paragraphs 1 – 19 of the Complaint are incorporated herein by reference.

30.     As outlined above, Connolly has engaged in conduct that violates the District of Columbia Uniform Trade Secrets Act, DC Code §§ 36-401 et seq.

31.     On July 28, 2020, without permission from the Company, Connolly improperly forwarded from his work e-mail address to his personal e-mail a confidential report prepared by the Company's Vice-President of Sales regarding on-going placements, price mark-ups, and revenue projections by sales person.

32.     This confidential information constitutes a trade secret.   The confidential information derives independent economic value because it is not generally known and not readily ascertainable by proper means by another person who can gain economic value from its disclosure or use.

33.     The confidential report was created by the Vice President of Sales for internal use only drawn from data in a password protected confidential database, was used by the Vice President of Sales to manage and direct her direct reports such as Connolly, displayed by her during a virtual meeting on July 28, 2020 by only sharing her computer screen, and was marked "confidential and proprietary."

34.     Despite the Company's undertaking reasonable efforts to protect the secrecy of this confidential information, Connolly wrongfully misappropriated this trade secret by an improper means by taking a screen shot with a snipping tool and then forwarding that image to his personal e-mail account for his use unrelated to his employment with the Company.

35.     Connolly had no right to purloin and retain this confidential information, and it was expressly in violation of the terms of his Employment Agreement.

36.     The Company has been damaged by Connolly's wrongful misappropriation of its trade secrets and is entitled to compensatory damages under D.C. Code § 36-405(a).

37.     Connolly's acts have been willful and malicious such that exemplary damages are warranted under D.C. Code § 36-403(b).

**WHEREFORE,** Plaintiff prays for relief as follows:

(1)     Enter a judgment against Defendant in favor of Plaintiff;

(2)     Enter injunctive relief the Court deems appropriate;

(3)     Award Plaintiff compensatory damages in an amount to be proven at trial, together with pre- and post-judgement interest;

(4)     Award Plaintiff liquidated damages pursuant to Section 5(e) of the Employment Agreement;

(5)     Award Plaintiff exemplary damages pursuant to D.C. Code § 36-403(b) in an amount to be proven at trial;

(6)     Award Plaintiff its attorneys' fees and litigation costs pursuant to Section 19 of the Employment Agreement and D.C. Code § 36-404(3); and

(7)     Award Plaintiff such other relief as the Court deems just and appropriate.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable.

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.

*/s/ Michael J. Murphy*
Michael J. Murphy, D.C. Bar No. 421287
1909 K Street, N.W., Suite 1000
Washington, D. C.  20006
Tel:  (202) 887-0855
Fax:  (202) 887-0866
Email: michael.murphy@ogletree.com
*Counsel for Plaintiff*

Dated:  October 27, 2020

44739479.1

10

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

**HIRECounsel DC, LLC**
1220 K Street, N.W., Suite 400
Washington, D.C.  20006

        **Plaintiff,**

    **v.**

**KILIAN CONNOLLY**
10 Brooks Court
Boston, MA  01950

        **Defendant.**

**Case No.** 2020 CA 004508 B

**COMPLAINT**

# EXHIBIT A

Employment Agreement

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of _____ by and between HIRECounsel DC, LLC, a District of Columbia limited liability company with an office at 1901 L Street, N.W., Washington, DC 20036 (the "COMPANY"), and Kilian Connolly, an individual residing at 10 Brooks Court, Boston, MA 01950 (the "EMPLOYEE").

**WHEREAS**, the COMPANY, together with its Affiliates (as hereinafter defined) is engaged in business in New York, NY; Los Angeles, CA; Boston, MA; Washington, D.C.; San Francisco, CA; Chicago, IL; Houston, TX; Miami, FL; Stamford, CT; Atlanta, GA; Philadelphia, PA; Kansas City, MO, Newark, NJ, Austin, TX, St. Louis, MO., Richmond, VA, Stamford, CT; and elsewhere as a permanent and temporary staffing service, specializing in the placement of attorneys, paralegals and legal support staff, including, but not limited to, coders and review management for legal services;

**WHEREAS,** the COMPANY and EMPLOYEE desires to employ the EMPLOYEE, and the EMPLOYEE desires to accept employment on the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the employment of the EMPLOYEE by the COMPANY, the above premises and the agreements hereinafter set forth, the parties agree as follows:

1. Nature of Employment.

(a) The COMPANY shall employ the EMPLOYEE and the EMPLOYEE accepts such employment with the COMPANY, upon the terms and subject to the conditions contained herein, as a Managing Director of Client Relations, responsible for: (i) marketing the services of the COMPANY to clients and potential clients in the Territory, which may include preparing proposals and pitching business; (ii) soliciting, obtaining business from and providing services to employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to coders; (iii) developing and maintaining relationships with employer-clients in the Territory, which may include coordinating meetings with clients and potential clients to explore potential new business and follow-up on existing business; (iv) fostering good relations with clients in the Territory; (v) supervising the COMPANY's job posting process with respect to open assignments that are potentially commissionable to EMPLOYEE in accordance with Exhibit A; (vi) recruiting, soliciting and providing services to

employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to, coders; (vii) recruiting, soliciting, interviewing and referring job candidates to employer-clients in the Territory; (viii) effecting the placement of job candidates with employer-clients in the Territory, which may include handling details and arrangements with respect to leased project work space, coordination of information technology issues and acting as a liaison between recruiters and clients; and (ix) engaging in such other duties and responsibilities as are consistent with the foregoing or assigned by the President of the Managing Member of the COMPANY (the "President") or the Chief Operating Officer of the Managing Member of the COMPANY (the "COO"). The "Territory" shall mean Boston, MA and the general surrounding areas. In addition Employee may conduct targeted marketing in Washington, DC and New York City and any other areas designated by the President, COO or Sales Manager. EMPLOYEE's employment shall commence as of _Feb2_____, 2015 (the "Commencement Date"), and continue until terminated as set forth herein.

(b) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to obtain the consent of the President or Chief Operating Officer, or National Managing Director of Sales of the COMPANY in writing or by e-mail prior to accepting any agreement or job order on behalf of the COMPANY or any of its Affiliates to provide temporary services on which the Mark-Up Percentage is less than sixty percent (60%). "Mark-Up Percentage" shall mean a percentage calculated as: (i) the aggregate anticipated rate per hour at which the relevant employer-client shall be billed less the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, divided by (ii) the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, and then multiplied by (iii) 100%. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

(c) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to conduct and complete any and all protocols associated with billing and collections, including but not limited to client vetting for new and existing customers. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to

2



place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

    2. Compensation, Expenses, Benefits, Vacation.

        (a)    As compensation for his services during the term of his employment with the COMPANY, the COMPANY shall pay the EMPLOYEE compensation as described on Exhibit A attached hereto and made a part hereof.

        (b)    The EMPLOYEE shall be entitled to reimbursement for reasonable travel, entertainment and other out-of-pocket expenses necessarily incurred in the performance of EMPLOYEE's duties hereunder, under submission and approval of written statements and bills in accordance with the then regular policies and procedures of the COMPANY.

        (c)    The EMPLOYEE shall be entitled to such other benefits offered by the COMPANY to employees with comparable duties and responsibilities as those of the EMPLOYEE, in accordance with the then regular procedures of the COMPANY governing employees as determined from time to time by the COMPANY. EMPLOYEE shall be entitled to participate in the group health insurance plan maintained by the COMPANY. Any and all benefits are subject to the applicable plan documents and may be amended, modified or terminated by the COMPANY or the applicable provider at any time.

        (d)    The EMPLOYEE shall be entitled to vacation and other leave in accordance with the COMPANY's policies applicable to comparable employees generally. The EMPLOYEE shall be entitled to three (3) weeks of vacation and five (5) personal or sick days for each twelve (12) months of employment, provided that during the first six (6) months after the Commencement Date the EMPLOYEE may not take more than two (2) consecutive days off other than for health reasons. The EMPLOYEE shall not be entitled to payment for unused personal or sick days upon the termination of EMPLOYEE's employment.

        (e)    The COMPANY may provide EMPLOYEE with access to company systems and email in accordance with the Mobile Device and Non-Corporate Computer Policy in Exhibit B.

        (f)    EMPLOYEE will be paid all compensation through the COMPANY's current parent company HC2, Inc. This is a payrolling arrangement and does not affect the terms

3



of this Agreement. The EMPLOYEE is an employee of the COMPANY and not an employee of HC2, Inc.

 3. Termination of Employment.

  (a) The EMPLOYEE's employment pursuant to this Agreement shall continue until terminated by the EMPLOYEE or the COMPANY by giving notice to the other for any reason or no reason.

  (b) This Agreement is not intended to and shall not be construed as creating a contract guaranteeing employment for any specified duration and either the EMPLOYEE or the COMPANY may end the employment relationship at any time with or without cause or for no cause.

 4. Confidential Information and Trade Secrets.

  (a) During the term of this Agreement the EMPLOYEE shall devote EMPLOYEE's reasonable best efforts and entire business time and energy to the performance of EMPLOYEE's duties and shall perform EMPLOYEE's duties to the best of EMPLOYEE's abilities. The EMPLOYEE shall not, during the term hereof, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others, actively engage in any other business, enterprise or undertaking, or prepare for, undertake or discuss with any other employees of the COMPANY, or any of its Affiliates, any business or professional employment of any kind, whether within the personnel or staffing industries or otherwise. For purposes of this Agreement "Affiliates" shall mean all successors, affiliates, subsidiaries and parents of the COMPANY, including, but not limited to, HC2, Inc.; HIRECounsel New York, LLC; HIRECounsel DC, LLC; Mestel & Company New York, LLC; Mestel & Company Chicago, LLC; The WOB Company, Inc.; Mestel & Company D.C., LLC; Mestel and Company Boston, LLC; Mestel & Company Miami, LLC; Mestel & Company Houston, LLC; Mestel & Company Los Angeles, Inc.; HIRECounsel Chicago, LLC; HIRECounsel Houston, LLC; HIRECounsel Miami, LLC; HIRECounsel Connecticut, LLC; HIRECounsel Atlanta, LLC; and HIRECounsel Philadelphia, LLC.

  (b) During and after EMPLOYEE's employment with the COMPANY, the EMPLOYEE agrees that EMPLOYEE will not use, disclose, copy or retain or remove from the COMPANY's premises any confidential or proprietary information or trade secrets, including, but not limited to, lists and information pertaining to clients and client contacts, job applicants, referrals,

4



and employees, and all other ideas, methods, procedures, techniques, written material, and other know-how, developed or used in connection with the COMPANY's or any of its Affiliates' business belonging to the COMPANY or any of its Affiliates (collectively, "Confidential Information"), other than for use in connection with authorized work performed for the COMPANY or such Affiliates.  Confidential Information shall also include, but not be limited to, the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and résumés of all persons who have applied to or been recruited by the COMPANY or any of its Affiliates for employment or placement and job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the COMPANY and its Affiliates, not generally available to others.  Confidential Information shall also include all information contained or stored in the confidential databases of the COMPANY and its Affiliates containing Confidential Information or other information of the COMPANY or its Affiliates (the "Confidential Database").

(c) The EMPLOYEE agrees that upon request by the COMPANY and in any event upon termination of employment, the EMPLOYEE shall turn over to the COMPANY all documents, papers or other material, including all copies thereof, in any form including electronic and hard copy, in EMPLOYEE's possession or under EMPLOYEE's control which may constitute, contain or be derived from Confidential Information, together with all documents, notes or other work product which is connected with or derived from the EMPLOYEE's services to the COMPANY whether or not such material is at the date hereof in the EMPLOYEE's possession.

(d) The Confidential Database is the property of and confidential to the COMPANY and its Affiliates and represents valuable, special and unique assets of the COMPANY, access to and knowledge of which are essential to EMPLOYEE's duties hereunder. EMPLOYEE shall take all precautions necessary to safeguard all Confidential Information and/or information contained in or derived from the Confidential Database against unauthorized use or reproduction by third parties.   Neither anything contained in this Section 4 nor EMPLOYEE's being given permission to access the Confidential Database from inside or outside the COMPANY's premises shall be deemed a waiver by the COMPANY of any of the restrictions and provisions contained herein.

5



(e) EMPLOYEE agrees that he shall not, and acknowledges that he is prohibited from, working or in any way collaborating with any third party either while employed by the COMPANY or following the termination of her employment with the COMPANY for any reason for any commercial or non-commercial purpose utilizing any Confidential Information.

(f) During the term of this Agreement, Employee agrees that he will not, directly or indirectly, own and interest in, operate, join, control, participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, or other entity which directly or indirectly competes with the COMPANY, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange.

5. Non-Competition

(a) EMPLOYEE agrees that during the term of this Agreement and for a period of twelve (12) months following EMPLOYEE ceasing to be an employee of the COMPANY, EMPLOYEE will not, without the prior written consent of the COMPANY, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others:

(i) solicit, divert or appropriate, or attempt to solicit, divert or appropriate, to any business which is either engaged in permanent or temporary placement or the same or substantially the same business of the COMPANY or any of its Affiliates (a "Competing Business"), any person or entity who is a client of the COMPANY or any of its Affiliates and with whom the EMPLOYEE worked, or had any contact while employed by the COMPANY, or whom EMPLOYEE would have been reasonably aware of as a client of the COMPANY at any time during the twelve (12) month period preceding the termination of this Agreement or of the EMPLOYEE's ceasing to be an employee of the COMPANY, or fill or attempt to fill, a job order or assignment which was obtained and pending with the COMPANY or any of its Affiliates, at the time of the EMPLOYEE's ceasing to be an employee of the COMPANY;

(ii) solicit, divert or hire away for or on behalf of any Competing Business, or attempt to solicit, divert or hire away for or on behalf of any Competing Business, including, without limitation, hiring or engaging as an employee or independent contractor any person employed by the COMPANY or any of its Affiliates, at any time during the twelve (12) months preceding EMPLOYEE ceasing to be an employee of the COMPANY, whether as a

6

temporary or permanent employee of the COMPANY and whether or not such employment by the COMPANY is or was pursuant to a written agreement and whether or not such employment by the COMPANY is or was for a determined period or is or was at will and whether or not the employee applied to a position with a Competing Business;

(iii)     contact, circularize or communicate with, in any manner, directly or indirectly, any of the COMPANY's or any of its Affiliates' applicants for permanent or temporary employment or temporary employees who were such at the time of the EMPLOYEE's termination or within twelve (12) months prior thereto whether or not the employee applied to a position with a Competing Business;

(iv)     contact, circularize or communicate with, in any manner, directly or indirectly, any clients or potential clients of the COMPANY or any of its Affiliates who EMPLOYEE contacted or communicated with on behalf of the COMPANY or whom EMPLOYEE would have been reasonably aware of was a client of the COMPANY or any of its Affiliates at any time within the twelve (12) months prior to the date of EMPLOYEE ceasing to be an employee of the COMPANY;

(v)     purchase, license, use or employ to use in any manner directly or indirectly any proprietary legal, attorney or paralegal, executive search computer software program utilized by the COMPANY, excluding any computer software programs utilized by any subsequent employer of the EMPLOYEE or any entity with which the EMPLOYEE becomes associated, prior to the EMPLOYEE's joining such employer or entity;

(vi)     accept employment with an employer which employs any person who is at such time or was within the twelve (12) month period prior thereto an employee of the COMPANY or any of its Affiliates, excluding employees of the COMPANY and its Affiliates who are placed as temporary employees with employer-clients; or

(vii)     directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any of the COMPANY's Affiliates, at which the EMPLOYEE is or was employed, performed services or engaged or assisted in the business or operations of the COMPANY or any of its Affiliates; or

7



(viii)   directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any office of any of its Affiliates.

(b) In the event of a breach of any of the covenants set forth in this Section 5, the running of the period of the restriction shall be tolled during the continuation of any such breach, and the running of the period of such restrictions shall resume only upon compliance with the terms of the applicable subparagraph.

(c) The EMPLOYEE agrees that each of EMPLOYEE's agreements set forth in this Agreement is reasonable and necessary to protect and preserve the business, interests and properties of the COMPANY and its Affiliates. In the event of a breach of any of the EMPLOYEE's covenants in this Agreement, the COMPANY and its Affiliates, shall be entitled to both temporary and permanent injunctions to prevent a breach or contemplated breach of any of the EMPLOYEE's covenants in this Agreement. The COMPANY also retains the right to seek other relief, including damages, which shall be the greater of the amount of the financial loss which the COMPANY and its Affiliates suffer as a result of a breach by the EMPLOYEE or the amount of the financial gain which the EMPLOYEE and any person or entity with whom the EMPLOYEE is associated, receives as a result of a breach by the EMPLOYEE. It is hereby provided that in the event of a breach by the EMPLOYEE of Section 3 or 5 of this Agreement, any Affiliate of the COMPANY has a right to seek relief for such breach as if such Affiliate was a party to this Agreement.

(d) If any court of competent jurisdiction shall determine any covenant set forth herein is unenforceable, then such covenant shall not be terminated but shall be deemed amended by substituting in its place and stead such restrictions as the court may deem reasonable under the circumstances or by striking the unenforceable language of the covenant, leaving the enforceable remainder; and all other provisions of this Agreement shall survive such determination and shall inure to the benefit of the COMPANY and its Affiliates and their successors and assigns. If any clause or provision of this Agreement is held to be excessively broad, that provision shall thereafter be deemed limited in scope and application only to the extent necessary to preserve its enforceability under the law. If any provision of this Agreement is held entirely unenforceable, that provision shall be deemed severed herefrom, and the remaining provisions of this Agreement shall be enforceable and shall be construed independent of that provision.

8

(e) The EMPLOYEE recognizes that the COMPANY has and will be making a significant investment of resources, financial and otherwise, into the success of the COMPANY and recognizes and agrees that the value of Confidential Information is, and the damage to the COMPANY caused by the EMPLOYEE's violation of any of the covenants and agreements contained in Sections 3 and 5(a) will be, significant and difficult to ascertain. It is therefore agreed that the COMPANY shall be entitled as payment from the EMPLOYEE and any person or entity involved in the violation of any of the provisions of Section 3 or 5(a) as a fair and reasonable estimate of the liquidated damages and not as a penalty the greater of: (i) the sum of forty thousand dollars ($40,000); and (ii) for each calendar week or part thereof that such violation continues, a sum equivalent to the greater of (A) one fifty-second ($\frac{1}{52}$) of the EMPLOYEE's total compensation from the COMPANY during the twelve (12) months before the initial date of the violation and (B) the gross commissions attributable to the EMPLOYEE's direct or indirect efforts during such calendar week of the violation. Any violation of Section 3 or 5(a) shall be deemed to continue for as long as the EMPLOYEE utilizes Confidential Information or continues to engage in business or transact business with any client, applicant for employment, temporary employee, former employee or independent contractor of the COMPANY or any of its Affiliates in violation of this Agreement.

(f) If the EMPLOYEE was not employed by the COMPANY for the full prior twelve (12) month period then the amount in Subpart (e)(ii)(A) above shall be a sum determined by dividing the total compensation received by the EMPLOYEE from the COMPANY, by the number of weeks the EMPLOYEE was employed by the COMPANY.

(g) The remedies contained herein are not exclusive, but are cumulative and the COMPANY may pursue any and all other relief available to it in equity or in law.

(h) After termination of the EMPLOYEE's employment with the COMPANY, the EMPLOYEE shall not indicate on any stationery, business card or advertising, solicitation or other business materials that EMPLOYEE was formerly an employee of the COMPANY or any Affiliate, division or subsidiary of the COMPANY except in the bona fide submission of résumés and the filling out of applications in the course of seeking employment.

6. Patents; Copyrights. Any interest in patents, patent applications, inventions, trademarks, trade dress, trade secrets, copyrights, developments and process (collectively "Inventions") which the EMPLOYEE, during EMPLOYEE's employment with the COMPANY, may own or develop

9

which specifically enhances the business of the COMPANY shall belong to the COMPANY; and forthwith upon request of the COMPANY, the EMPLOYEE shall execute all such assignments and other documents and take all such other action as the COMPANY may reasonably request in order to vest in the COMPANY all of EMPLOYEE's right, title, and interest in and to such Inventions, free and clear of all liens, charges and encumbrances.

7. Representations, Warranties and Covenants of EMPLOYEE.

(a) The EMPLOYEE confirms to the COMPANY that EMPLOYEE is free to enter the COMPANY's employ and has made no agreement and has no obligation inconsistent with unrestrained employment with the COMPANY other than the employment agreement EMPLOYEE entered into with his former employer Trustpoint Interntational, LLC and its successors or assigns ("Trustpoint"), dated as of March 29, 2011, (the "Trustpoint Agreement").

(b) The EMPLOYEE represents, warrants and covenants that the EMPLOYEE: (i) has not told or communicated to, and shall not tell or communicate to, any client, candidate or employee of or any other person associated with EMPLOYEE's prior employer that EMPLOYEE is leaving to be employed by the COMPANY prior to the Commencement Date; (ii) is not in violation of, and shall not violate, any written or oral agreement that EMPLOYEE is a party to by entering the employ of the COMPANY; (iii) has not copied or physically retained, and will not copy or physically retain, any document of any of EMPLOYEE's former employers; (iv) has not purposefully memorized, and will not purposefully memorize, any confidential customer lists or trade secrets of any of EMPLOYEE's former employers; and (v) has not solicited, and will not solicit, any clients, employees or candidates of any former employer prior to the termination of EMPLOYEE's employment with that employer other than on behalf of such former employer. The EMPLOYEE acknowledges that EMPLOYEE may not directly solicit job candidates of any prior employer after the Commencement Date, except based upon information obtained independent of such prior employment.

(c) EMPLOYEE represents and warrants that there exists no other agreement between him and TRUSTPOINT other than the TRUSTPOINT Agreement. EMPLOYEE expressly acknowledges that in the event any lawsuit is brought, or as determined by the COMPANY in the COMPANY's discretion, may be brought, against EMPLOYEE and/or the COMPANY or any of its Affiliates by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY

10

may terminate EMPLOYEE's employment immediately without any liability to EMPLOYEE other than for amounts earned by, but not yet paid to, EMPLOYEE as of the termination date. The EMPLOYEE acknowledges he is an employee at-will and agrees that he will have no claim against the COMPANY or any of its Affiliates as a result of such termination. Nothing contained in this Agreement is intended in any way to abrogate the employment at-will relationship between the EMPLOYEE and the COMPANY. The EMPLOYEE agrees that in the event any lawsuit is brought against EMPLOYEE by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY shall in no way be responsible for his resulting attorneys' fees or other legal costs and the EMPLOYEE shall not seek to join the COMPANY in any such lawsuit.

(d) The EMPLOYEE hereby agrees to indemnify and hold the COMPANY harmless from all costs, expenses, judgments and reasonable attorneys' fees incurred in connection with any legal proceeding commenced against the COMPANY or any of its Affiliates based upon a breach of any of the representations, warranties and covenants contained in this Section 7. The COMPANY may offset against any sums due to the EMPLOYEE, any amount due to the COMPANY by reason of the foregoing indemnity and any damages sustained by the COMPANY or any of its Affiliates by reason of a breach of any of the foregoing representations, warranties and covenants.

(e) Notwithstanding section 7(c)-(d), the COMPANY shall indemnify EMPLOYEE from and against any and all costs of defense, judgments, fines and amounts in settlement suffered by the EMPLOYEE if EMPLOYEE becomes a party to any claim, suit, action or other legal proceeding by his/her former employer relating specifically to the Employee acting in the scope of his/her employment with the COMPANY and consistent with the express instruction given by the President or COO of the COMPANY. EMPLOYEE shall have an affirmative duty to disclose potential activities to the President or COO that would violate his former employment agreement and give rise to a legal proceeding. Such indemnification shall not extend to any such claims brought by EMPLOYEE's former employer for willful misconduct, criminal or other negligent act which arose during the course of Employee's former employment, nor shall such indemnification cover any act not related to EMPLOYEE acting within the scope of his employment with the COMPANY, nor in the event that EMPLOYEE did

11

not timely disclose information to the President or COO which caused the President or COO to instruct EMPLOYEE to conduct himself in a manner that gave rise to the legal proceeding.

8. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to conflicts of law principles.

9. Entire Agreement. This Agreement herewith embodies the entire agreement and understanding by and between the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to the employment of the EMPLOYEE by the COMPANY or any of its Affiliates.

10. Notice. Any notice required to be given under this Agreement shall be in writing and delivered by certified mail, return receipt requested to the parties at their addresses set forth above or any other address given by a party to the other in accordance with this Section.

11. Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either of the parties hereto without the prior written consent of the other party, except the COMPANY may assign this Agreement or any of the rights, interests or obligations hereunder to any of its Affiliates or any successor to all or a portion of its business without prior written consent from the EMPLOYEE. This Agreement is not intended to confer upon any person except the parties and the COMPANY's Affiliates any rights or remedies hereunder.

12. Waiver. The waiver of any breach of this Agreement by any party at any time shall not be effective unless in writing, and no such waiver shall constitute the waiver of the same or another breach on a subsequent occasion. Moreover, no delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.

13. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

14. Pronouns. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

12

15. Modification. Neither this Agreement, nor any of its provisions, may be changed, modified or cancelled except by mutual written consent of all the undersigned.

16. Severability. If any of the provisions of this Agreement are or become unenforceable, the remainder of this Agreement shall nevertheless remain binding to the fullest extent possible, taking into consideration the purposes and spirit of this Agreement.

17. Survival. The covenants, agreements, representations and warranties contained in or made pursuant to this Agreement shall survive the termination of the EMPLOYEE's employment by the COMPANY, irrespective of any investigation made by or on behalf of any party.

18. Arbitration.

(a) Except as provided in Subsection 18(b), any dispute arising out of this Agreement shall be settled by arbitration before a panel of three (3) arbitrators in Washington, D.C., in accordance with the employment arbitration rules then obtaining of the American Arbitration Association or its successor. The parties hereto agree that any judgment, settlement or award rendered pursuant to such arbitration shall be a final and binding determination as to the matters described therein, and a judgment of any federal, state or other court of competent jurisdiction shall be entered upon the award made pursuant to the arbitration. Each of the parties hereto hereby consents to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding in connection with any proceeding to enforce or in connection with any such arbitration. Each of the parties hereto waives any objection that it may have to the conduct of any such action or proceeding in any such court based on improper venue or forum non conveniens, waives personal service of any and all process upon it and consents that all service of process may be made by mail or courier service directed to it at the address set forth in this Agreement and that service so made shall be deemed to be completed upon the earlier of actual receipt or four (4) days after the same shall have been posted. Nothing contained in this Subsection shall affect the right of any party hereto to enforce any judgment obtained in a court of competent jurisdiction in any other court or serve legal process or in any other manner permitted by law.

(b) EMPLOYEE acknowledges that a breach of Section 4 or 5 would cause irreparable injury to the COMPANY and to the COMPANY's Affiliates. Therefore, EMPLOYEE agrees that upon a breach or anticipated breach of Section 4 or 5 the COMPANY

13

shall have the immediate right to secure a court order enjoining any such breach. This covenant shall be independent and severable and shall be enforceable notwithstanding any other rights or remedies that either party may have. The parties consent to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding resulting from any breach or anticipated breach of Section 4 or 5 by the EMPLOYEE.

19. <u>Costs</u>. The parties agree that in the event it becomes necessary for the COMPANY to seek judicial or arbitration remedies for the breach or threatened breach of this Agreement, the COMPANY shall be entitled, in addition to all other remedies, to recover from EMPLOYEE all of its costs arising as a result of such action or arbitration, including reasonable attorneys' fees and all such costs related to any appeal.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the Commencement Date.

HIRECOUNSEL DC, LLC

By: _____

Name: Willa Fawer
Title: Chief Operating Officer

_____

**Kilian Connolly**

14

EXHIBIT A

(a) **Salary.**  EMPLOYEE shall be entitled to an annual salary at the rate of $75,000 per year, to be paid in equal periodic installments, plus commissions as set forth below.  All salary and other amounts payable to EMPLOYEE shall be paid less applicable taxes and withholdings and in accordance with the COMPANY's regular payroll practices.

(c)     Temporary Placement Commissions for Sales

(i)     Base Sales Commission Rate.  In the event the EMPLOYEE is solely responsible without assistance for bringing to the COMPANY an employer-client, who has not given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior thereto (a "Commissionable Client"), the EMPLOYEE shall be entitled to receive a commission based upon a sliding scale of Gross Margin from 12% to 30% or greater translating to a commission rate of 5% to 18% of Gross Profit Dollars.  Any business with less than 12% Gross Margin does not receive a commission.  The following table describes the Gross Margin and the corresponding Base Sales Commission Rates that will result.

| Gross Margin | Estimated Mark-Up (information only) | Base Sales Commission Rate |
|---|---|---|
| <12.0% | <30.0% | 0.0% |
| 12.0-15.9% | 30.0-36.9% | 5.0% |
| 16.0-16.9% | 37.0-38.9% | 6.0% |
| 17.0-17.9% | 39.0-39.9% | 7.0% |
| 18.0-18.9% | 40.0-41.9% | 8.0% |
| 19.0-19.9% | 42.0-43.9% | 9.0% |
| 20.0-20.9% | 44.0-45.9% | 10.0% |
| 21.0-21.9% | 46.0-47.9% | 11.0% |
| 22.0-22.9% | 48.0-49.9% | 12.0% |
| 23.0-23.9% | 50.0-50.9% | 13.0% |
| 24.0-24.9% | 51.0-52.9% | 14.0% |
| 25.0-25.9% | 52.9-54.9% | 15.0% |
| 26.0-27.9% | 55.0-59.9% | 16.0% |
| 28.0-29.9% | 60.0-64.9% | 17.0% |
| >=30% | >65.0% | 18.0% |

(ii)     Commission Rate Multiplier. In addition to the Base Sales Commission Rate, the Company is providing a Commission Rate Multiplier based upon Gross Profit Dollars of $300,000 or more (the "Sales Commission Rate Multiplier"). The Multiplier is a sliding scale and applies to all commissions for temporary placements where the Gross Profit Dollars are over $300,000, and can increase your Base Sales Commission Rates by 1% to 5% resulting in a Multiplied Commission Rate. The Sales Commission Rate Multiplier is determined on a per invoice basis and is always off of the Base Sales Commission Rate. The Gross Profit Dollars and the Sales Commission Rate Multiplier will be calculated on an annual calendar basis and the Gross Profit Dollars will be reset to zero each January 1st.

| Gross Profit Dollars Each Calendar Year | Multiplier on Base Sales Commission Rate for each invoice |
|---|---|
| $0-299,999 | 100% |
| $300,000 – 999,999 | 110% |
| $1,000,000 – 1,499,999 | 115% |
| $1,500,000 – 1,999,999 | 120% |
| $2,000,000 – 2,499,999 | 125% |
| $2,500,000 – 2,999,999 | 130% |
| $3,000,000 – 3,499,999 | 135% |
| $3,500,000 – 3,999,999 | 140% |
| >=$4,000,000 | 150% |

### *Example of Sales Commission Rate Multiplier*

During the week ending July 13th, your Gross Profits Dollars are $500,000 for the calendar year, the Sales Commission Rate Multiplier is therefore 110% and each Base Sales Commission Rate for that week-ending would be multiplied by 110%. Therefore a job with a 5% Base Sales Commission Rate will be multiplied by 110% and the resulting Multiplied Commission Rate for that invoice on that week-ending will be 5.5%. On the same week-ending an invoice with a 10% Base Sales Commission Rate, will be multiplied by 110% and the Multiplied Commission Rate for that invoice on that week-ending will become 11%. An invoice on the same week-ending with a 15% commission rate multiplied by 110% will generate a 16.5% Commission Rate. If later in the year, your Gross Profit Dollars exceed $2,000,000, then the Base Sales Commission Rate is multiplied by 125%, so an invoice with a Base Sales Commission Rate of 5% will result in a Multiplied Commission Rate of 6.25%.

It is important to note that the multiplier is always on the original Base Sales Commission

Rate. For example if during one week ending, a Job ABC generates an invoice resulting in a 5% Base Sales Commission Rate is eligible for a Sales Commission Rate Multiplier of 110% and later in the year the same Job ABC is eligible for a Sales Commission Rate Multiplier is 120%, the resulting Multiplied Commission Rates are 5.5% (110% times 5%) and 6% (120% times 5%) consecutively.

(iii)    **Splits.** In the event EMPLOYEE generates Gross Profit Dollars with the assistance or as a result of the introduction of either the President, the COO and/or another employee of the COMPANY or any of its Affiliates, the EMPLOYEE shall be entitled to receive a pro-rated commission Base Sales Commission Rate in proportion to assistance provided. For example, if the Gross Margin is 20% on a project, the Base Sales Commission Rate is therefore 10%, and EMPLOYEE and one other person use equal effort to generate the business then, the Base Sales Commission Rate will be split 50% and 50%, resulting in each person receiving a 5% Base Sales Commission Rate. A Multiplier on Base Sales Commission Rate for each Invoice will apply as described above.

(iv)    If the EMPLOYEE is entitled to a commission under this Section (d) with respect to a new client or job order, EMPLOYEE shall be entitled to such commission under either Subsection (d)(i) or (d)(iii), but not more than one of the foregoing Subsections. All decisions regarding (A) whether or not the EMPLOYEE is entitled to a commission with respect to a new client or job order under this Section (d), (B) whether a commission is calculated pursuant to Subsection (d)(i), (d)(ii) or (d)(iii), including, but not limited to, determining whether EMPLOYEE's assistance was integral to the COMPANY in bringing in an employer-client or obtaining a job order and (C) the commission rate pursuant to Subsection (d)(iv) shall be made by the President or COO in their sole discretion.

(v)    EMPLOYEE shall be entitled to payment of EMPLOYEE's commissions under this Subsection (d), when the Net Profits are paid to the COMPANY on a monthly basis. Notwithstanding that commissions may have been paid to the EMPLOYEE, such commissions shall not be deemed earned by the EMPLOYEE unless and until the expiration of all applicable grace periods with respect to a particular placement and the full payment to the COMPANY, and/or the factoring company, as the case may be. In the event of the termination of this Agreement, the EMPLOYEE shall remain liable to the COMPANY with respect to any unearned commission advanced to EMPLOYEE and the COMPANY may hold back any payment otherwise due to the EMPLOYEE until the expiration of such grace periods or the payment to the COMPANY or the factoring company, as the case may be.

(vi)    In no event shall the EMPLOYEE be entitled to receive any commissions on Net Profits under this Section (d) resulting from any employer-client who has given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior to EMPLOYEE assisting with such client.

(d)     Conversion Commissions.

(i)     In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission as outlined in the Recruiter Commission Rate schedule of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies or (ii) the relevant employer-client is a Commissionable Client. The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion.   All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)    The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From a Conversion of a Commissionable Clients credited to the EMPLOYEE for placements in permanent positions in accordance with the COMPANY's policies for crediting fees provided the placement fee is at 15% or greater. The commission rate will adjusted pro-rata or at the discretion of the COPMANY in the event the placement fee is lower than 15%.

Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period. The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)   "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee. In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

(iv)    The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (f)(ii) and (iii) above.   In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

(e)     Permanent Placement Commissions.

(i)     The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From Permanent Placement Services from Commissionable Clients credited to the EMPLOYEE for placements in permanent paralegal positions in accordance with the COMPANY's policies for crediting fees.

18



(ii)     Commissions on Collections From Permanent Placement Services will not be earned or considered earned until the expiration of period of time during which, if the employment of the applicant terminates with the client who paid the fee, the COMPANY would be obligated to refund the fee or provide a credit, in whole or in part (the "Guaranty Period"). The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)     "Collections From Permanent Placement Services" shall mean, for the relevant period, fees generated and received by the COMPANY for the permanent placement of job candidates with Commissionable Clients, less any refunds, credits, fall-offs, discounts and/or other rebates given or owing to Commissionable Clients less any split fees or other payments or credits on or with respect to such fees paid or payable or owing at any time to other placement services or recruiters (which may be Affiliates of the COMPANY and shall be credited by the COMPANY and others in accordance with COMPANY's policies as in effect from time to time) and less legal fees, if any, expended to collect such receipts.

(iv)     The EMPLOYEE agrees that no commission on a particular placement shall be earned or considered earned until the completion of the conditions precedent set forth above in Subsections (d)(ii) and (iii) above.  In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned prior to the date of termination.

(v)     For purposes of clarification, the commissions referred to in this Section (c) assume that placement fees are at least fifteen percent (15%) for paralegals or at least twenty percent (20%) for attorneys of the placements first year base salary. Commission rates will be adjusted pro-rata or at the discretion of the COMPANY in the event placement fees are less than 15% for paralegals or less than 20% for attorneys.

(f)     <u>Conversion Commissions.</u>

(i)     In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission of 5% of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies, or (ii) the relevant employer-client is a Commissionable Client and (iii) the sales revenue for the temporary placement was at a thirty-five percent (35%) or greater mark-up as defined by the COMPANY. Commission rates will be adjusted pro-rata or at the discretion of the COMPANY for Sales revenue that is generated at less than a thirty-five percent (35%) mark-up. The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion. All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)     Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period. The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

19

(iii)    "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee.  In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

(iv)    The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (e)(ii) and (iii) above.   In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

(g)    **Advances.**  Notwithstanding anything herein to the contrary, the COMPANY may, in its sole and absolute discretion, advance to the EMPLOYEE all or any portion of a commission on a placement prior to the expiration of the Guaranty Period or prior to the full receipt by the COMPANY of all of the fees or other amounts due and owing to it for the placements on which such commission is based.  In such event, the COMPANY shall reduce the amount otherwise owed to the EMPLOYEE for the relevant placement by the amount of any advances made to the EMPLOYEE for such placement and shall recoup such advance or portion of such advance from any commission owed to the EMPLOYEE.  In the event a commission has been advanced to the EMPLOYEE, in whole or in part, which the EMPLOYEE is not ultimately entitled, the EMPLOYEE agrees to immediately refund in full to the COMPANY any and all such unearned advances made to the EMPLOYEE by the COMPANY.

(h)    **Changes to Compensation.**  Notwithstanding anything herein to the contrary, commission rates and other compensation set forth herein may be changed at the sole discretion of the COMPANY at any time upon written notice to the EMPLOYEE which notice and change shall be effective for all revenues received, placements made and compensation earned after such notice.

(i)    **Works In Progress.**  EMPLOYEE shall not be entitled to: (A) a commission on any work in progress, meaning on any revenues received or client approved time billed by temporary employees after the termination of the EMPLOYEE's employment, or (B) a commission on any permanent placements where the commission has not yet been earned in accordance with the terms of this Agreement at the time of termination of EMPLOYEE's employment.

**EXHIBIT B**

## MOBILE DEVICE AND NON-CORPORATE COMPUTER ADDENDUM TO EMPLOYMENT AGREEMENT

This Information Technology Addendum ( the "IT Addendum") defines the standards, procedures, and restrictions applicable to Employee's use of mobile devices, including, but not limited to Blackberries, iPhones, iPads, smart phones or other such mobile devices Employee may use to access Company's network or conduct business on behalf of the Company (collectively, "**Mobile Devices**") and any computers, laptops, or tablets that are not issued by the Company that Employee may use to access Company's network or conduct business on behalf of the Company (collectively "**Non-Corporate Computers**"). This IT Addendum is intended to protect Company's technology-based resources, including computer and network systems, databases and other Confidential Information (collectively, "**Technology Resources**") and Company Data (as defined below) from unauthorized use or disclosure and/or a malicious attack resulting from Employee's use of a Mobile Device or Non-Corporate Computer. "**Company Data**" means all Company information, data and databases.

The Parties agree as follows:

1.      **Responsible Use**.  Employee agrees to use Mobile Devices, Non-Corporate Computers, and Company Technology Resources appropriately, responsibly, ethically and in compliance with the Employment Agreement, Company's Information Processing Systems Policy, Employee Handbook, and the Confidentiality Agreement executed by the Parties. Employee is responsible for backing up all personal data contained on such devices.  Company is not responsible for any personal data.

2.      **Password Requirements**.  Employee shall maintain reasonable access control measures on Mobile Devices and Non-Corporate Computers, including, but not limited to, a power-on password as well as an inactivity-triggered password. Employee agrees to protect such passwords from unauthorized use and never share or disclose his/her passwords to anyone, other than as directed Company.  Passwords may not be printed, stored online and if possible, must be comprised of a combination of letters and numbers which are not in a sequence or otherwise easy to decipher.

3.      **Responsibility for Data and Voice Fees**.  The Employee acknowledges that the Employee is solely responsible for all fees for data and voice services associated with any Employee Company Device, except to the extent expressly agreed to by the Company.

4.      **Location and Disabling Requirements**.  If available, Employee shall enable features on his/her Non-Corporate Computer and Mobile Device to enable Employee and/or the Company to locate lost or stolen equipment and/or to remotely disable such devices and/or disable access to any Company Data. If Employee needs assistance enabling such features, Company's IT Department will provide such assistance.

5. **Anti-Virus Requirements**. Any Non-Corporate Computers used by Employee to synchronize with Employee's Mobile Device must utilize prevailing industry standard antivirus software and vice-versa. The Company further recommends use of prevailing industry standard antivirus applications for any Mobile Devices and Non-Corporate Computers. Please contact the Company's IT Department to the extent you have any questions regarding recommendations.

6. **Registration with Company**. Employee shall make known to the Company which Mobile Devices and Non-Corporate Computers Employee will be using in conjunction with Company Technology Resources. If applicable, Company's IT department may register, configure, and set-up Employee's Mobile Devices and Non-Corporate Computers.

7. **Use Restrictions**. Employee shall not:

    a.   make any modifications of any kind to software, if any, installed by Company on a Mobile Device or Non-Corporate Computer;

    b.   use any Company Technology Resources to load any pirated software or illegal content on to any Mobile Device or Non-Corporate Computer;

    c.   use a Mobile Device or Non-Corporate Computer to make unauthorized disclosure of Company Data; or

    d.   use a Mobile Device or Non-Corporate Computer to violate or attempt to violate any local, state, federal or international law.

    e.   use Company Technology Resources for any purpose other than Company business purposes.

8. **Segregation of Company Email From Personal Communications**. Employee agrees to be cautious about the merging of personal and work email accounts, calendars, task lists or other applications on a Mobile Device or Non-Corporate Computer. Employee will take particular care to ensure that Company Data is only sent through the Company's email system and is segregated from personal data.

9. **Downloading/Storage of Company Data to Mobile Devices or Non-Corporate Computer; Remote Access of Company Files and Systems**. Company Data may not be downloaded to a Mobile Device or Non-Corporate Computer for any non-work related purposes. The storage of such data could compromise the confidentiality of such Company Data and therefore is not permitted. For example, Employee may not save and store email attachments for access locally on a Mobile Device or Non-Corporate Computer but shall instead access such documents via the Company email system or other Company Technology Resources. Notwithstanding the foregoing, Employees may only access the Company's computer files, systems and other Technology Resources upon the prior written consent of the Officer of the Company and on such terms and conditions as set forth by the Officer.

10.     **Reporting Lost or Stolen Devices or Other Incidents**.   Employee shall immediately report to his/her supervisor and Company's IT Department: (a) any lost or stolen Mobile Device or Non-Corporate Computer or (b) any incident or suspected incident of unauthorized access of Company's networks and/or unauthorized disclosure of Company Data. Employee agrees to reasonably cooperate with Company to protect any Company Data and/or remedy any incident.

11.     **Company Right to Monitor; No Expectation of Privacy**.   Employee agrees and acknowledges that, except as prohibited by law, Company may (but is not obligated to) monitor, record, and review Employee's communications in connection with Company Technology Resources, including access to Company's networks and resources, including, without limitation, the dates, times, and duration of Employee's access to the Company's network. Employee acknowledges that he/she shall have no expectation of privacy in anything that he/she creates, stores, sends or receives on or through the Company Technology Resources by use of any Mobile Device or Non-Corporate Computer. Company does not anticipate monitoring its Technology Resources absent a legitimate business purpose, including, e.g., investigating possible theft or espionage, monitoring work flow, retrieving missing Company Data, evaluating compliance with Company policies, and so forth.

12.     **Confidentiality of Company Data**. The Parties agree and acknowledge all Company Data accessed or stored on the Employee's Mobile Device or Non-Corporate Computer shall be deemed to be Company Confidential Information for the purposes of the Employment Agreement and Confidentiality Agreement.

13.     **Deletion of Company Data Upon Termination of Employment**. Upon the earlier of Company's request or Employee's termination of employment with Company, Employee shall provide Company with access to Employee's Mobile Device or Non-Corporate Computer in order to allow Company to delete or otherwise remove Company Data from Employee's Mobile Device or Non-Corporate Computer.

14.     **Compliance with Applicable Laws**. All Employees must comply with all applicable software licenses, copyrights, and other national/federal, state and international laws and regulations governing intellectual property, online activities, and data protection.

15.     Disclaimer of Liability. COMPANY ASSUMES NO LIABILITY FOR LOSS, DAMAGE, DESTRUCTION, ALTERATION, DISCLOSURE, OR MISUSE OF ANY PERSONAL DATA OR COMMUNICATIONS TRANSMITTED OVER OR STORED ON A MOBILE DEVICE OR NON-CORPORATE COMPUTER. COMPANY ACCEPTS NO RESPONSIBILITY OR LIABILITY FOR THE LOSS OR NON-DELIVERY OF ANY PERSONAL ELECTRONIC MAIL OR VOICEMAIL COMMUNICATIONS OR ANY PERSONAL DATA STORED ON ANY MOBILE DEVICE OR NON-CORPORATE COMPUTER. EMPLOYEE EXPRESSLY ACKNOWLEDGES AND AGREES TO RELEASE COMPANY FROM ANY AND ALL CLAIMS, INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S ACCESS TO EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS,

23

**INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S
DELETION OF EMPLOYEE'S PERSONAL DATA OR INFORMATION ON
EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER.**

16.     **Penalty for Violations**.  The Parties agree and acknowledge that Employee's
violation of the terms of this IT Addendum may result in disciplinary action, including but not
limited to termination of employment.

17.     **Entirety**.  This IT Addendum, together with the Employment Agreement,
Company's Information Processing Systems Policy, Employee Handbook and the
Confidentiality Agreement executed by the Employee represents the entire agreement between
the parties with respect to the subject matter hereof.

24

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

**HIRECounsel DC, LLC**
1220 K Street, N.W., Suite 400
Washington, D.C.  20006

        **Plaintiff,**

   **v.**

**KILIAN CONNOLLY**
10 Brooks Court
Boston, MA  01950

        **Defendant.**

**Case No.** <u>2020 CA 004508</u> B

**COMPLAINT**

# EXHIBIT B

Connolly Resignation Email

| | |
|---|---|
| **From:** | Kilian Connolly <kconnolly@hirecounsel.com> |
| **Sent:** | Friday, August 7, 2020 12:38 PM |
| **To:** | Andreana Nelson; Joan Davison; Patti Ayala |
| **Cc:** | Kilian Connolly |
| **Subject:** | Notice of Resignation |

Andreana Nelson
Joan Davison
Patti Ayala
Hire Counsel

Dear Colleagues:

This letter represents my official notice of resignation from my position of Managing Director of Client Relations with Hire Counsel effective the end of today, Friday August 7th, 2020.

I have updated notes in the system with current activity.  I will reach out to whomever you would like me to reach out to on future activity and meeting dates.   I will be leaving my Hire Counsel-issued IT equipment in the office as well as the office keys and pass.

It has been a pleasure to work alongside the individuals at HCMC and will always treasure my experience here and the friendships I have developed at such and outstanding organization.

Kindest Regards,

**Kilian Connolly**
*Managing Director*



470 Atlantic Avenue, 4th Floor  Boston, MA 02210
617.419.2512 **Direct**  978.518.2228 **Mobile**
kconnolly@hirecounsel.com
https://www.linkedin.com/in/kilianconnolly


Please browse our case studies to see how Hire Counsel can provide efficient options on your next special project:
https://www.hirecounsel.com/case-studies/

Industry Awards 2019
★  *Largest Legal Staffing Firms in the US* | Staffing Industry Analysts
★  *Best of Legal Recruiters* | National Law Journal

*Confidentiality Notice:*  This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address and any unauthorized disclosure, copying, distribution, or reliance upon the contents is strictly prohibited.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that Hire Counsel/Mestel & Company can arrange for proper delivery and then please delete the message from your inbox.  Thank you.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

**HIRECounsel DC, LLC**
1220 K Street, N.W., Suite 400
Washington, D.C.  20006

        **Plaintiff,**

  v.

**KILIAN CONNOLLY**
10 Brooks Court
Boston, MA  01950

        **Defendant.**

**Case No.**  2020 CA 004508 B

<u>**COMPLAINT**</u>

# EXHIBIT C

September 23, 2020 Cease and Desist Letter to Connolly

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

# Ogletree Deakins

Michael J. Murphy
202-263-0250
michael.murphy@ogletreedeakins.com

September 23, 2020

**<u>Via E-Mail (kilian.connolly@comcast.net) and Federal Express</u>**

Mr. Kilian Connolly
10 Brooks Court
Boston, MA 01950

RE:    <u>Your Post-Employment Obligations to HIRECounsel DC, LLC</u>

Dear Mr. Connolly:

This law firm represents HIRECounsel DC, LLC ("HIRECounsel," or the "Company") in connection with matters relating to the protection of its good will and its confidential and proprietary information, including the enforcement of agreements designed to protect such information and of the Company's rights with respect to misappropriation of trade secrets. HIRECounsel takes these matters extremely seriously, and will take all necessary and appropriate measures to safeguard its rights and to protect good will and its confidential and proprietary information from any unauthorized or illegal use or disclosure.

As you know, you entered into an Employment Agreement (the "Agreement") with HIRECounsel, dated as of January 6, 2015. A copy of that Agreement is enclosed for your ease of reference. Under the terms of that Agreement, you agreed that for a period of twelve (12) months following the termination of your employment with the Company (the "Restricted Period"), you would not, directly or indirectly,

- solicit, divert or appropriate, or attempt to solicit, divert or appropriate, to any Competing Business any person or entity who was a client of the Company or any of its Affiliates and with whom you worked or had any contact while employed by the Company at any time during the twelve (12) month period preceding the termination of the Agreement or of your ceasing to be an employee of the Company;

- fill or attempt to fill a job order or assignment which was obtained and pending with the Company or any of its Affiliates at the time of your ceasing to be an employee of the Company;

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Mr. Kilian Connolly
September 23, 2020
Page 2

- solicit, divert or hire away for or on behalf of any Competing Business, or attempt to solicit, divert or hire away for or on behalf of any Competing Business, including, without limitation, hiring or engaging as an employee or independent contractor any person employed by the Company or any of its Affiliates, at any time during the twelve (12) months preceding your ceasing to be an employee of the Company;

- contact, circularize or communicate with, in any manner, directly or indirectly, any of the Company's or any of its Affiliates' applicants for permanent or temporary employment or temporary employees who were such at the time of your termination or within twelve (12) months prior thereto;

- contact, circularize or communicate with, in any manner, directly or indirectly, any clients or potential clients of the Company or any of its Affiliates who you contacted or communicated with on behalf of the Company or any of its Affiliates at any time within the twelve (12) months prior to the date of your ceasing to be an employee of the Company;

- directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the Company or any of the Company's Affiliates, at which you are or were employed, performed services or engaged or assisted in the business or operations of the Company or any of its Affiliates; or

- directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the Company or any office of any of its Affiliates.

*See* Agreement, Section 5(a)(i)-(iv), (vii)-(viii). The Agreement defines the term "Competing Business" as any "business which is either engaged in permanent or temporary placement or the same or substantially the same business of the C[ompany] or any of its Affiliates." *See id.*, Section 5(a)(i). You also agreed that the twelve-month Restricted Period would be extended by the length of time during which you are in breach of your non-solicitation and non-competition obligations. *See id.*, Section 5(b).

In addition to the non-competition and non-solicitation restrictions described above, the Agreement also contains provisions that bar you from using or disclosing HIRECounsel's confidential information and trade secrets. In particular, you agreed that during and after your employment with the Company, you would "not use, disclose, copy or retain or remove from the C[ompany]'s premises any confidential or proprietary information or trade secrets." *See* Agreement, Section 4(b). The confidential or proprietary information and trade secrets ("Confidential Information") that are protected by this provision include, without limitation, "lists and information pertaining to clients or client contacts, job applicants, referrals, and employees, and all other ideas,

Mr. Kilian Connolly
September 23, 2020
Page 3

methods, procedures, techniques, written material, and other know-how, developed or used in connection with the C[ompany]'s or any of its Affiliates' business belonging to the C[ompany] or any of its Affiliates," as well as "the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and resumes of all persons who have applied to or been recruited by the C[ompany] or any of its Affiliates for employment or placement and job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the C[ompany] and its Affiliates, not generally available to others," and "all information contained or stored in the confidential databases of the C[ompany] and its Affiliates." *See id.* As a trusted and high-level employee of HIRECounsel, you were provided with and exposed to a vast quantity of its Confidential Information, including in particular Confidential Information about the Company's clients, accounts, operations, processes, methods, business plans, margins and mark-ups, and strategies.

Finally, in addition to other remedies, the Agreement provides for liquidated damages in favor of HIRECounsel for breaches of the above-referenced provisions and establishes legal venue for the resolution of any such breaches in court in Washington, D.C.

Accordingly, HIRECounsel was very surprised and concerned to learn recently that you are now employed as a Senior Account Executive with its competitor, Beacon Hill Staffing Group ("BHSG"), in its legal specialty division, providing the same legal staffing and document review services you provided as an employee of HIRECounsel within 75 miles of HIRECounsel's Boston office, where you formerly worked. As you know, BHSG, and, in particular, its legal specialty division, is (like HIRECounsel) a professional staffing company that provides permanent and temporary staffing services, including the placement of attorneys, paralegals, legal support staff, and document review services. As such, BHSG is in direct competition with HIRECounsel. Also, as a BHSG Senior Account Executive, you are based in Boston. Thus, there is no question that your employment with BHSG in Boston falls directly within the scope of businesses for whom, under the plain terms of your Agreement, you may not perform legal staffing and document review services during the twelve-month Restricted Period. In addition, the highly sensitive Confidential Information that you have acquired and been exposed to in connection with your employment with HIRECounsel, and that you are required by your Agreement not only to protect but also to refrain from using or disclosing, relates directly to the highly competitive markets in which both BHSG and HIRECounsel operate.

Our surprise and concern have been heightened by our recent discovery that, shortly before you resigned from your employment with HIRECounsel, you sent some of the Company's most highly sensitive and confidential proprietary information from your Company account to your personal e-mail address. You had no legitimate business reason connected with your work to send that information to your personal e-mail address, and by doing so you violated Section 4(b) of the Agreement, in which you agreed that you would not "remove from the C[ompany's] premises any confidential or proprietary information or trade secrets"; and by failing to return that information to the Company upon the termination of your employment, you violated Agreement Section 4(c).

Mr. Kilian Connolly
September 23, 2020
Page 4

HIRECounsel has invested significant time and monetary resources in its business. Indeed, as you acknowledged in the Agreement, HIRECounsel has made a "significant investment of resources, financial and otherwise, into the success" of the Company, and the damages that your violation of any of the covenants and agreements described above will cause the Company to suffer "will be significant and difficult to ascertain." As a result, HIRECounsel is serious about enforcing its contractual rights under its Agreements with you, in order to safeguard its legitimate business interests, employee relationships, and confidential information. Therefore, HIRECounsel demands that you honor your post-employment obligations under the Agreement, that you cease performing legal staffing and document review services for BHSG at their Boston office and within 75 miles of HIRECounsel's Boston office (and any other HIRECounsel Office at which you worked or serviced clients such as Washington, D.C. or New York) that you performed for HIRECounsel until the twelve-month Restricted Period has expired, and that you refrain from any use or disclosure of the Company's Confidential Information to or on behalf of BHSG or anyone else other than the Company. HIRECounsel further demands (i) that you *immediately* return to the Company any and all documents, including e-mails and other data, that contain the Company's Confidential Information, including without limitation the information referred to above that you sent to your personal e-mail account, and (ii) that you do not engage in any future conduct in violation of your post-employment obligations to the Company.

Should you continue to conduct yourself in a manner that violates your obligations to HIRECounsel, under the Agreement or otherwise, the Company will seek all available remedies permitted by law. Those remedies include, but are not limited to, initiating legal action under the Agreement against you in court in Washington, D.C., seeking (1) injunctive relief, including an order restraining you from engaging in further conduct that violates the Agreement, (2) a monetary judgment against you for the damages caused by your conduct, and (3) all other remedies available to the Company at law, in equity, or otherwise.

Finally, HIRECounsel hereby demands that by no later than September 30, 2020, you provide written assurance to me (1) that you will cease providing the aforementioned legal staffing and contract review services to BHSG within 75 miles of your former HIRECounsel Boston office (or any other HIRECounsel Office at which you worked or serviced clients) at any time during the twelve-month Restricted Period following the termination of your employment with the Company, (2) that within seven (7) calendar days of your response you will provide a detailed accounting of all of HIRECounsel's Confidential Information in your possession, custody, or control, including without limitation all information that you sent to your personal e-mail account, (3) that within seven (7) calendar days of your response you will return all of HIRECounsel's Confidential Information in your possession, custody, or control, (4) that you will confirm that you have not disclosed or shared any of HIRECounsel's Confidential Information with any third party, including, but not limited to, BHSG, and (5) that you will destroy any electronic copies of HIRECounsel's Confidential Information. Nothing in this letter excuses you of your violations of the Agreement or constitutes a waiver by HIRECounsel of any of its remedies under the Agreement for those violations.

Mr. Kilian Connolly
September 23, 2020
Page 5

Very truly yours,

Michael J. Murphy

Enclosure

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of _____, by and between HIRECounsel DC, LLC, a District of Columbia limited liability company with an office at 1901 L Street, N.W., Washington, DC   20036 (the "COMPANY"), and Kilian Connolly, an individual residing at 10 Brooks Court, Boston, MA 01950 (the "EMPLOYEE").

**WHEREAS**, the COMPANY, together with its Affiliates (as hereinafter defined) is engaged in business in New York, NY; Los Angeles, CA; Boston, MA; Washington, D.C.; San Francisco, CA; Chicago, IL; Houston, TX; Miami, FL; Stamford, CT; Atlanta, GA; Philadelphia, PA; Kansas City, MO, Newark, NJ, Austin, TX, St. Louis, MO., Richmond, VA, Stamford, CT; and elsewhere as a permanent and temporary staffing service, specializing in the placement of attorneys, paralegals and legal support staff, including, but not limited to, coders and review management for legal services;

**WHEREAS,** the COMPANY and EMPLOYEE desires to employ the EMPLOYEE, and the EMPLOYEE desires to accept employment on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the employment of the EMPLOYEE by the COMPANY, the above premises and the agreements hereinafter set forth, the parties agree as follows:

1. Nature of Employment.

(a) The COMPANY shall employ the EMPLOYEE and the EMPLOYEE accepts such employment with the COMPANY, upon the terms and subject to the conditions contained herein, as a Managing Director of Client Relations, responsible for:  (i) marketing the services of the COMPANY to clients and potential clients in the Territory, which may include preparing proposals and pitching business; (ii) soliciting, obtaining business from and providing services to employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to coders; (iii) developing and maintaining relationships with employer-clients in the Territory, which may include coordinating meetings with clients and potential clients to explore potential new business and follow-up on existing business; (iv) fostering good relations with clients in the Territory; (v) supervising the COMPANY's job posting process with respect to open assignments that are potentially commissionable to EMPLOYEE in accordance with Exhibit A; (vi) recruiting, soliciting and providing services to

employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to, coders; (vii) recruiting, soliciting, interviewing and referring job candidates to employer-clients in the Territory; (viii) effecting the placement of job candidates with employer-clients in the Territory, which may include handling details and arrangements with respect to leased project work space, coordination of information technology issues and acting as a liaison between recruiters and clients; and (ix) engaging in such other duties and responsibilities as are consistent with the foregoing or assigned by the President of the Managing Member of the COMPANY (the "President") or the Chief Operating Officer of the Managing Member of the COMPANY (the "COO"). The "Territory" shall mean Boston, MA and the general surrounding areas. In addition Employee may conduct targeted marketing in Washington, DC and New York City and any other areas designated by the President, COO or Sales Manager. EMPLOYEE's employment shall commence as of _Feb2_____, 2015 (the "Commencement Date"), and continue until terminated as set forth herein.

(b) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to obtain the consent of the President or Chief Operating Officer, or National Managing Director of Sales of the COMPANY in writing or by e-mail prior to accepting any agreement or job order on behalf of the COMPANY or any of its Affiliates to provide temporary services on which the Mark-Up Percentage is less than sixty percent (60%). "Mark-Up Percentage" shall mean a percentage calculated as: (i) the aggregate anticipated rate per hour at which the relevant employer-client shall be billed less the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, divided by (ii) the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, and then multiplied by (iii) 100%. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

(c) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to conduct and complete any and all protocols associated with billing and collections, including but not limited to client vetting for new and existing customers. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to

2



place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

2. Compensation, Expenses, Benefits, Vacation.

(a)    As compensation for his services during the term of his employment with the COMPANY, the COMPANY shall pay the EMPLOYEE compensation as described on Exhibit A attached hereto and made a part hereof.

(b)    The EMPLOYEE shall be entitled to reimbursement for reasonable travel, entertainment and other out-of-pocket expenses necessarily incurred in the performance of EMPLOYEE's duties hereunder, under submission and approval of written statements and bills in accordance with the then regular policies and procedures of the COMPANY.

(c)    The EMPLOYEE shall be entitled to such other benefits offered by the COMPANY to employees with comparable duties and responsibilities as those of the EMPLOYEE, in accordance with the then regular procedures of the COMPANY governing employees as determined from time to time by the COMPANY.  EMPLOYEE shall be entitled to participate in the group health insurance plan maintained by the COMPANY.  Any and all benefits are subject to the applicable plan documents and may be amended, modified or terminated by the COMPANY or the applicable provider at any time.

(d)    The EMPLOYEE shall be entitled to vacation and other leave in accordance with the COMPANY's policies applicable to comparable employees generally.  The EMPLOYEE shall be entitled to three (3) weeks of vacation and five (5) personal or sick days for each twelve (12) months of employment, provided that during the first six (6) months after the Commencement Date the EMPLOYEE may not take more than two (2) consecutive days off other than for health reasons.  The EMPLOYEE shall not be entitled to payment for unused personal or sick days upon the termination of EMPLOYEE's employment.

(e)    The COMPANY may provide EMPLOYEE with access to company systems and email in accordance with the Mobile Device and Non-Corporate Computer Policy in Exhibit B.

(f)    EMPLOYEE will be paid all compensation through the COMPANY's current parent company HC2, Inc.  This is a payrolling arrangement and does not affect the terms

3

of this Agreement. The EMPLOYEE is an employee of the COMPANY and not an employee of HC2, Inc.

3. Termination of Employment.

(a) The EMPLOYEE's employment pursuant to this Agreement shall continue until terminated by the EMPLOYEE or the COMPANY by giving notice to the other for any reason or no reason.

(b) This Agreement is not intended to and shall not be construed as creating a contract guaranteeing employment for any specified duration and either the EMPLOYEE or the COMPANY may end the employment relationship at any time with or without cause or for no cause.

4. Confidential Information and Trade Secrets.

(a) During the term of this Agreement the EMPLOYEE shall devote EMPLOYEE's reasonable best efforts and entire business time and energy to the performance of EMPLOYEE's duties and shall perform EMPLOYEE's duties to the best of EMPLOYEE's abilities. The EMPLOYEE shall not, during the term hereof, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others, actively engage in any other business, enterprise or undertaking, or prepare for, undertake or discuss with any other employees of the COMPANY, or any of its Affiliates, any business or professional employment of any kind, whether within the personnel or staffing industries or otherwise. For purposes of this Agreement "Affiliates" shall mean all successors, affiliates, subsidiaries and parents of the COMPANY, including, but not limited to, HC2, Inc.; HIRECounsel New York, LLC; HIRECounsel DC, LLC; Mestel & Company New York, LLC; Mestel & Company Chicago, LLC; The WOB Company, Inc.; Mestel & Company D.C., LLC; Mestel and Company Boston, LLC; Mestel & Company Miami, LLC; Mestel & Company Houston, LLC; Mestel & Company Los Angeles, Inc.; HIRECounsel Chicago, LLC; HIRECounsel Houston, LLC; HIRECounsel Miami, LLC; HIRECounsel Connecticut, LLC; HIRECounsel Atlanta, LLC; and HIRECounsel Philadelphia, LLC.

(b) During and after EMPLOYEE's employment with the COMPANY, the EMPLOYEE agrees that EMPLOYEE will not use, disclose, copy or retain or remove from the COMPANY's premises any confidential or proprietary information or trade secrets, including, but not limited to, lists and information pertaining to clients and client contacts, job applicants, referrals,

4



and employees, and all other ideas, methods, procedures, techniques, written material, and other know-how, developed or used in connection with the COMPANY's or any of its Affiliates' business belonging to the COMPANY or any of its Affiliates (collectively, "Confidential Information"), other than for use in connection with authorized work performed for the COMPANY or such Affiliates. Confidential Information shall also include, but not be limited to, the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and résumés of all persons who have applied to or been recruited by the COMPANY or any of its Affiliates for employment or placement and job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the COMPANY and its Affiliates, not generally available to others. Confidential Information shall also include all information contained or stored in the confidential databases of the COMPANY and its Affiliates containing Confidential Information or other information of the COMPANY or its Affiliates (the "Confidential Database").

(c) The EMPLOYEE agrees that upon request by the COMPANY and in any event upon termination of employment, the EMPLOYEE shall turn over to the COMPANY all documents, papers or other material, including all copies thereof, in any form including electronic and hard copy, in EMPLOYEE's possession or under EMPLOYEE's control which may constitute, contain or be derived from Confidential Information, together with all documents, notes or other work product which is connected with or derived from the EMPLOYEE's services to the COMPANY whether or not such material is at the date hereof in the EMPLOYEE's possession.

(d) The Confidential Database is the property of and confidential to the COMPANY and its Affiliates and represents valuable, special and unique assets of the COMPANY, access to and knowledge of which are essential to EMPLOYEE's duties hereunder. EMPLOYEE shall take all precautions necessary to safeguard all Confidential Information and/or information contained in or derived from the Confidential Database against unauthorized use or reproduction by third parties. Neither anything contained in this Section 4 nor EMPLOYEE's being given permission to access the Confidential Database from inside or outside the COMPANY's premises shall be deemed a waiver by the COMPANY of any of the restrictions and provisions contained herein.

5

(e) EMPLOYEE agrees that he shall not, and acknowledges that he is prohibited from, working or in any way collaborating with any third party either while employed by the COMPANY or following the termination of her employment with the COMPANY for any reason for any commercial or non-commercial purpose utilizing any Confidential Information.

(f) During the term of this Agreement, Employee agrees that he will not, directly or indirectly, own and interest in, operate, join, control, participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, or other entity which directly or indirectly competes with the COMPANY, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange.

5. Non-Competition

(a) EMPLOYEE agrees that during the term of this Agreement and for a period of twelve (12) months following EMPLOYEE ceasing to be an employee of the COMPANY, EMPLOYEE will not, without the prior written consent of the COMPANY, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others:

(i) solicit, divert or appropriate, or attempt to solicit, divert or appropriate, to any business which is either engaged in permanent or temporary placement or the same or substantially the same business of the COMPANY or any of its Affiliates (a "Competing Business"), any person or entity who is a client of the COMPANY or any of its Affiliates and with whom the EMPLOYEE worked, or had any contact while employed by the COMPANY, or whom EMPLOYEE would have been reasonably aware of as a client of the COMPANY at any time during the twelve (12) month period preceding the termination of this Agreement or of the EMPLOYEE's ceasing to be an employee of the COMPANY, or fill or attempt to fill, a job order or assignment which was obtained and pending with the COMPANY or any of its Affiliates, at the time of the EMPLOYEE's ceasing to be an employee of the COMPANY;

(ii) solicit, divert or hire away for or on behalf of any Competing Business, or attempt to solicit, divert or hire away for or on behalf of any Competing Business, including, without limitation, hiring or engaging as an employee or independent contractor any person employed by the COMPANY or any of its Affiliates, at any time during the twelve (12) months preceding EMPLOYEE ceasing to be an employee of the COMPANY, whether as a

6

temporary or permanent employee of the COMPANY and whether or not such employment by the COMPANY is or was pursuant to a written agreement and whether or not such employment by the COMPANY is or was for a determined period or is or was at will and whether or not the employee applied to a position with a Competing Business;

(iii)     contact, circularize or communicate with, in any manner, directly or indirectly, any of the COMPANY's or any of its Affiliates' applicants for permanent or temporary employment or temporary employees who were such at the time of the EMPLOYEE's termination or within twelve (12) months prior thereto whether or not the employee applied to a position with a Competing Business;

(iv)     contact, circularize or communicate with, in any manner, directly or indirectly, any clients or potential clients of the COMPANY or any of its Affiliates who EMPLOYEE contacted or communicated with on behalf of the COMPANY or whom EMPLOYEE would have been reasonably aware of was a client of the COMPANY or any of its Affiliates at any time within the twelve (12) months prior to the date of EMPLOYEE ceasing to be an employee of the COMPANY;

(v)     purchase, license, use or employ to use in any manner directly or indirectly any proprietary legal, attorney or paralegal, executive search computer software program utilized by the COMPANY, excluding any computer software programs utilized by any subsequent employer of the EMPLOYEE or any entity with which the EMPLOYEE becomes associated, prior to the EMPLOYEE's joining such employer or entity;

(vi)     accept employment with an employer which employs any person who is at such time or was within the twelve (12) month period prior thereto an employee of the COMPANY or any of its Affiliates, excluding employees of the COMPANY and its Affiliates who are placed as temporary employees with employer-clients; or

(vii)     directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any of the COMPANY's Affiliates, at which the EMPLOYEE is or was employed, performed services or engaged or assisted in the business or operations of the COMPANY or any of its Affiliates; or

7



(viii)   directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any office of any of its Affiliates.

(b) In the event of a breach of any of the covenants set forth in this Section 5, the running of the period of the restriction shall be tolled during the continuation of any such breach, and the running of the period of such restrictions shall resume only upon compliance with the terms of the applicable subparagraph.

(c) The EMPLOYEE agrees that each of EMPLOYEE's agreements set forth in this Agreement is reasonable and necessary to protect and preserve the business, interests and properties of the COMPANY and its Affiliates. In the event of a breach of any of the EMPLOYEE's covenants in this Agreement, the COMPANY and its Affiliates, shall be entitled to both temporary and permanent injunctions to prevent a breach or contemplated breach of any of the EMPLOYEE's covenants in this Agreement. The COMPANY also retains the right to seek other relief, including damages, which shall be the greater of the amount of the financial loss which the COMPANY and its Affiliates suffer as a result of a breach by the EMPLOYEE or the amount of the financial gain which the EMPLOYEE and any person or entity with whom the EMPLOYEE is associated, receives as a result of a breach by the EMPLOYEE. It is hereby provided that in the event of a breach by the EMPLOYEE of Section 3 or 5 of this Agreement, any Affiliate of the COMPANY has a right to seek relief for such breach as if such Affiliate was a party to this Agreement.

(d) If any court of competent jurisdiction shall determine any covenant set forth herein is unenforceable, then such covenant shall not be terminated but shall be deemed amended by substituting in its place and stead such restrictions as the court may deem reasonable under the circumstances or by striking the unenforceable language of the covenant, leaving the enforceable remainder; and all other provisions of this Agreement shall survive such determination and shall inure to the benefit of the COMPANY and its Affiliates and their successors and assigns. If any clause or provision of this Agreement is held to be excessively broad, that provision shall thereafter be deemed limited in scope and application only to the extent necessary to preserve its enforceability under the law. If any provision of this Agreement is held entirely unenforceable, that provision shall be deemed severed herefrom, and the remaining provisions of this Agreement shall be enforceable and shall be construed independent of that provision.

8

(e) The EMPLOYEE recognizes that the COMPANY has and will be making a significant investment of resources, financial and otherwise, into the success of the COMPANY and recognizes and agrees that the value of Confidential Information is, and the damage to the COMPANY caused by the EMPLOYEE's violation of any of the covenants and agreements contained in Sections 3 and 5(a) will be, significant and difficult to ascertain. It is therefore agreed that the COMPANY shall be entitled as payment from the EMPLOYEE and any person or entity involved in the violation of any of the provisions of Section 3 or 5(a) as a fair and reasonable estimate of the liquidated damages and not as a penalty the greater of: (i) the sum of forty thousand dollars ($40,000); and (ii) for each calendar week or part thereof that such violation continues, a sum equivalent to the greater of (A) one fifty-second ($^1/_{52}$) of the EMPLOYEE's total compensation from the COMPANY during the twelve (12) months before the initial date of the violation and (B) the gross commissions attributable to the EMPLOYEE's direct or indirect efforts during such calendar week of the violation. Any violation of Section 3 or 5(a) shall be deemed to continue for as long as the EMPLOYEE utilizes Confidential Information or continues to engage in business or transact business with any client, applicant for employment, temporary employee, former employee or independent contractor of the COMPANY or any of its Affiliates in violation of this Agreement.

(f) If the EMPLOYEE was not employed by the COMPANY for the full prior twelve (12) month period then the amount in Subpart (e)(ii)(A) above shall be a sum determined by dividing the total compensation received by the EMPLOYEE from the COMPANY, by the number of weeks the EMPLOYEE was employed by the COMPANY.

(g) The remedies contained herein are not exclusive, but are cumulative and the COMPANY may pursue any and all other relief available to it in equity or in law.

(h) After termination of the EMPLOYEE's employment with the COMPANY, the EMPLOYEE shall not indicate on any stationery, business card or advertising, solicitation or other business materials that EMPLOYEE was formerly an employee of the COMPANY or any Affiliate, division or subsidiary of the COMPANY except in the bona fide submission of résumés and the filling out of applications in the course of seeking employment.

6. Patents; Copyrights. Any interest in patents, patent applications, inventions, trademarks, trade dress, trade secrets, copyrights, developments and process (collectively "Inventions") which the EMPLOYEE, during EMPLOYEE's employment with the COMPANY, may own or develop

9

which specifically enhances the business of the COMPANY shall belong to the COMPANY; and forthwith upon request of the COMPANY, the EMPLOYEE shall execute all such assignments and other documents and take all such other action as the COMPANY may reasonably request in order to vest in the COMPANY all of EMPLOYEE's right, title, and interest in and to such Inventions, free and clear of all liens, charges and encumbrances.

      7.  Representations, Warranties and Covenants of EMPLOYEE.

      (a) The EMPLOYEE confirms to the COMPANY that EMPLOYEE is free to enter the COMPANY's employ and has made no agreement and has no obligation inconsistent with unrestrained employment with the COMPANY other than the employment agreement EMPLOYEE entered into with his former employer Trustpoint Interntational, LLC and its successors or assigns ("Trustpoint"), dated as of March 29, 2011, (the "Trustpoint Agreement").

      (b) The EMPLOYEE represents, warrants and covenants that the EMPLOYEE: (i) has not told or communicated to, and shall not tell or communicate to, any client, candidate or employee of or any other person associated with EMPLOYEE's prior employer that EMPLOYEE is leaving to be employed by the COMPANY prior to the Commencement Date; (ii) is not in violation of, and shall not violate, any written or oral agreement that EMPLOYEE is a party to by entering the employ of the COMPANY; (iii) has not copied or physically retained, and will not copy or physically retain, any document of any of EMPLOYEE's former employers; (iv) has not purposefully memorized, and will not purposefully memorize, any confidential customer lists or trade secrets of any of EMPLOYEE's former employers; and (v) has not solicited, and will not solicit, any clients, employees or candidates of any former employer prior to the termination of EMPLOYEE's employment with that employer other than on behalf of such former employer. The EMPLOYEE acknowledges that EMPLOYEE may not directly solicit job candidates of any prior employer after the Commencement Date, except based upon information obtained independent of such prior employment.

      (c) EMPLOYEE represents and warrants that there exists no other agreement between him and TRUSTPOINT other than the TRUSTPOINT Agreement. EMPLOYEE expressly acknowledges that in the event any lawsuit is brought, or as determined by the COMPANY in the COMPANY's discretion, may be brought, against EMPLOYEE and/or the COMPANY or any of its Affiliates by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY

10

may terminate EMPLOYEE's employment immediately without any liability to EMPLOYEE other than for amounts earned by, but not yet paid to, EMPLOYEE as of the termination date. The EMPLOYEE acknowledges he is an employee at-will and agrees that he will have no claim against the COMPANY or any of its Affiliates as a result of such termination. Nothing contained in this Agreement is intended in any way to abrogate the employment at-will relationship between the EMPLOYEE and the COMPANY. The EMPLOYEE agrees that in the event any lawsuit is brought against EMPLOYEE by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY shall in no way be responsible for his resulting attorneys' fees or other legal costs and the EMPLOYEE shall not seek to join the COMPANY in any such lawsuit.

(d) The EMPLOYEE hereby agrees to indemnify and hold the COMPANY harmless from all costs, expenses, judgments and reasonable attorneys' fees incurred in connection with any legal proceeding commenced against the COMPANY or any of its Affiliates based upon a breach of any of the representations, warranties and covenants contained in this Section 7. The COMPANY may offset against any sums due to the EMPLOYEE, any amount due to the COMPANY by reason of the foregoing indemnity and any damages sustained by the COMPANY or any of its Affiliates by reason of a breach of any of the foregoing representations, warranties and covenants.

(e) Notwithstanding section 7(c)-(d), the COMPANY shall indemnify EMPLOYEE from and against any and all costs of defense, judgments, fines and amounts in settlement suffered by the EMPLOYEE if EMPLOYEE becomes a party to any claim, suit, action or other legal proceeding by his/her former employer relating specifically to the Employee acting in the scope of his/her employment with the COMPANY and consistent with the express instruction given by the President or COO of the COMPANY. EMPLOYEE shall have an affirmative duty to disclose potential activities to the President or COO that would violate his former employment agreement and give rise to a legal proceeding. Such indemnification shall not extend to any such claims brought by EMPLOYEE's former employer for willful misconduct, criminal or other negligent act which arose during the course of Employee's former employment, nor shall such indemnification cover any act not related to EMPLOYEE acting within the scope of his employment with the COMPANY, nor in the event that EMPLOYEE did

11

not timely disclose information to the President or COO which caused the President or COO to instruct EMPLOYEE to conduct himself in a manner that gave rise to the legal proceeding.

8. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to conflicts of law principles.

9. <u>Entire Agreement</u>. This Agreement herewith embodies the entire agreement and understanding by and between the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to the employment of the EMPLOYEE by the COMPANY or any of its Affiliates.

10. <u>Notice</u>. Any notice required to be given under this Agreement shall be in writing and delivered by certified mail, return receipt requested to the parties at their addresses set forth above or any other address given by a party to the other in accordance with this Section.

11. <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either of the parties hereto without the prior written consent of the other party, except the COMPANY may assign this Agreement or any of the rights, interests or obligations hereunder to any of its Affiliates or any successor to all or a portion of its business without prior written consent from the EMPLOYEE. This Agreement is not intended to confer upon any person except the parties and the COMPANY's Affiliates any rights or remedies hereunder.

12. <u>Waiver</u>. The waiver of any breach of this Agreement by any party at any time shall not be effective unless in writing, and no such waiver shall constitute the waiver of the same or another breach on a subsequent occasion. Moreover, no delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.

13. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

14. <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

12



15. <u>Modification</u>.  Neither this Agreement, nor any of its provisions, may be changed, modified or cancelled except by mutual written consent of all the undersigned.

16. <u>Severability</u>.  If any of the provisions of this Agreement are or become unenforceable, the remainder of this Agreement shall nevertheless remain binding to the fullest extent possible, taking into consideration the purposes and spirit of this Agreement.

17. <u>Survival</u>.  The covenants, agreements, representations and warranties contained in or made pursuant to this Agreement shall survive the termination of the EMPLOYEE's employment by the COMPANY, irrespective of any investigation made by or on behalf of any party.

18. <u>Arbitration</u>.

(a) Except as provided in Subsection 18(b), any dispute arising out of this Agreement shall be settled by arbitration before a panel of three (3) arbitrators in Washington, D.C., in accordance with the employment arbitration rules then obtaining of the American Arbitration Association or its successor.  The parties hereto agree that any judgment, settlement or award rendered pursuant to such arbitration shall be a final and binding determination as to the matters described therein, and a judgment of any federal, state or other court of competent jurisdiction shall be entered upon the award made pursuant to the arbitration.  Each of the parties hereto hereby consents to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding in connection with any proceeding to enforce or in connection with any such arbitration.  Each of the parties hereto waives any objection that it may have to the conduct of any such action or proceeding in any such court based on improper venue or forum non conveniens, waives personal service of any and all process upon it and consents that all service of process may be made by mail or courier service directed to it at the address set forth in this Agreement and that service so made shall be deemed to be completed upon the earlier of actual receipt or four (4) days after the same shall have been posted.  Nothing contained in this Subsection shall affect the right of any party hereto to enforce any judgment obtained in a court of competent jurisdiction in any other court or serve legal process or in any other manner permitted by law.

(b) EMPLOYEE acknowledges that a breach of Section 4 or 5 would cause irreparable injury to the COMPANY and to the COMPANY's Affiliates.  Therefore, EMPLOYEE agrees that upon a breach or anticipated breach of Section 4 or 5 the COMPANY

13

shall have the immediate right to secure a court order enjoining any such breach. This covenant shall be independent and severable and shall be enforceable notwithstanding any other rights or remedies that either party may have. The parties consent to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding resulting from any breach or anticipated breach of Section 4 or 5 by the EMPLOYEE.

19. Costs. The parties agree that in the event it becomes necessary for the COMPANY to seek judicial or arbitration remedies for the breach or threatened breach of this Agreement, the COMPANY shall be entitled, in addition to all other remedies, to recover from EMPLOYEE all of its costs arising as a result of such action or arbitration, including reasonable attorneys' fees and all such costs related to any appeal.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the Commencement Date.

HIRECOUNSEL DC, LLC

By: _____

Name: Willa Fawer
Title: Chief Operating Officer

_____

**Kilian Connolly**

14

## EXHIBIT A

**(a) Salary.**  EMPLOYEE shall be entitled to an annual salary at the rate of $75,000 per year, to be paid in equal periodic installments, plus commissions as set forth below.  All salary and other amounts payable to EMPLOYEE shall be paid less applicable taxes and withholdings and in accordance with the COMPANY's regular payroll practices.

(c)     <u>Temporary Placement Commissions for Sales</u>

(i)     Base Sales Commission Rate.  In the event the EMPLOYEE is solely responsible without assistance for bringing to the COMPANY an employer-client, who has not given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior thereto (a "Commissionable Client"), the EMPLOYEE shall be entitled to receive a commission based upon a sliding scale of Gross Margin from 12% to 30% or greater translating to a commission rate of 5% to 18% of Gross Profit Dollars.  Any business with less than 12% Gross Margin does not receive a commission.  The following table describes the Gross Margin and the corresponding Base Sales Commission Rates that will result.

| Gross Margin | Estimated Mark-Up (information only) | Base Sales Commission Rate |
|---|---|---|
| <12.0% | <30.0% | 0.0% |
| 12.0-15.9% | 30.0-36.9% | 5.0% |
| 16.0-16.9% | 37.0-38.9% | 6.0% |
| 17.0-17.9% | 39.0-39.9% | 7.0% |
| 18.0-18.9% | 40.0-41.9% | 8.0% |
| 19.0-19.9% | 42.0-43.9% | 9.0% |
| 20.0-20.9% | 44.0-45.9% | 10.0% |
| 21.0-21.9% | 46.0-47.9% | 11.0% |
| 22.0-22.9% | 48.0-49.9% | 12.0% |
| 23.0-23.9% | 50.0-50.9% | 13.0% |
| 24.0-24.9% | 51.0-52.9% | 14.0% |
| 25.0-25.9% | 52.9-54.9% | 15.0% |
| 26.0-27.9% | 55.0-59.9% | 16.0% |
| 28.0-29.9% | 60.0-64.9% | 17.0% |
| >=30% | >65.0% | 18.0% |

(ii)     Commission Rate Multiplier.  In addition to the Base Sales Commission Rate, the Company is providing a Commission Rate Multiplier based upon Gross Profit Dollars of $300,000 or more (the "Sales Commission Rate Multiplier").  The Multiplier is a sliding scale and applies to all commissions for temporary placements where the Gross Profit Dollars are over $300,000, and can increase your Base Sales Commission Rates by 1% to 5% resulting in a Multiplied Commission Rate.  The Sales Commission Rate Multiplier is determined on a per invoice basis and is always off of the Base Sales Commission Rate.  The Gross Profit Dollars and the Sales Commission Rate Multiplier will be calculated on an annual calendar basis and the Gross Profit Dollars will be reset to zero each January 1st.

| Gross Profit Dollars Each Calendar Year | Multiplier on Base Sales Commission Rate for each invoice |
| --- | --- |
| $0-299,999 | 100% |
| $300,000 – 999,999 | 110% |
| $1,000,000 – 1,499,999 | 115% |
| $1,500,000 – 1,999,999 | 120% |
| $2,000,000 – 2,499,999 | 125% |
| $2,500,000 – 2,999,999 | 130% |
| $3,000,000 – 3,499,999 | 135% |
| $3,500,000 – 3,999,999 | 140% |
| >=$4,000,000 | 150% |

### *Example of Sales Commission Rate Multiplier*

During the week ending July 13th, your Gross Profits Dollars are $500,000 for the calendar year, the Sales Commission Rate Multiplier is therefore 110% and each Base Sales Commission Rate for that week-ending would be multiplied by 110%. Therefore a job with a 5% Base Sales Commission Rate will be multiplied by 110% and the resulting Multiplied Commission Rate for that invoice on that week-ending will be 5.5%. On the same week-ending an invoice with a 10% Base Sales Commission Rate, will be multiplied by 110% and the Multiplied Commission Rate for that invoice on that week-ending will become 11%. An invoice on the same week-ending with a 15% commission rate multiplied by 110% will generate a 16.5% Commission Rate.  If later in the year, your Gross Profit Dollars exceed $2,000,000, then the Base Sales Commission Rate is multiplied by 125%, so an invoice with a Base Sales Commission Rate of 5% will result in a Multiplied Commission Rate of 6.25%.

It is important to note that the multiplier is always on the original Base Sales Commission

Rate. For example if during one week ending, a Job ABC generates an invoice resulting in a 5% Base Sales Commission Rate is eligible for a Sales Commission Rate Multiplier of 110% and later in the year the same Job ABC is eligible for a Sales Commission Rate Multiplier is 120%, the resulting Multiplied Commission Rates are 5.5% (110% times 5%) and 6% (120% times 5%) consecutively.

(iii) **Splits.** In the event EMPLOYEE generates Gross Profit Dollars with the assistance or as a result of the introduction of either the President, the COO and/or another employee of the COMPANY or any of its Affiliates, the EMPLOYEE shall be entitled to receive a pro-rated commission Base Sales Commission Rate in proportion to assistance provided. For example, if the Gross Margin is 20% on a project, the Base Sales Commission Rate is therefore 10%, and EMPLOYEE and one other person use equal effort to generate the business then, the Base Sales Commission Rate will be split 50% and 50%, resulting in each person receiving a 5% Base Sales Commission Rate. A Multiplier on Base Sales Commission Rate for each Invoice will apply as described above.

(iv) If the EMPLOYEE is entitled to a commission under this Section (d) with respect to a new client or job order, EMPLOYEE shall be entitled to such commission under either Subsection (d)(i) or (d)(iii), but not more than one of the foregoing Subsections. All decisions regarding (A) whether or not the EMPLOYEE is entitled to a commission with respect to a new client or job order under this Section (d), (B) whether a commission is calculated pursuant to Subsection (d)(i), (d)(ii) or (d)(iii), including, but not limited to, determining whether EMPLOYEE's assistance was integral to the COMPANY in bringing in an employer-client or obtaining a job order and (C) the commission rate pursuant to Subsection (d)(iv) shall be made by the President or COO in their sole discretion.

(v) EMPLOYEE shall be entitled to payment of EMPLOYEE's commissions under this Subsection (d), when the Net Profits are paid to the COMPANY on a monthly basis. Notwithstanding that commissions may have been paid to the EMPLOYEE, such commissions shall not be deemed earned by the EMPLOYEE unless and until the expiration of all applicable grace periods with respect to a particular placement and the full payment to the COMPANY, and/or the factoring company, as the case may be. In the event of the termination of this Agreement, the EMPLOYEE shall remain liable to the COMPANY with respect to any unearned commission advanced to EMPLOYEE and the COMPANY may hold back any payment otherwise due to the EMPLOYEE until the expiration of such grace periods or the payment to the COMPANY or the factoring company, as the case may be.

(vi) In no event shall the EMPLOYEE be entitled to receive any commissions on Net Profits under this Section (d) resulting from any employer-client who has given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior to EMPLOYEE assisting with such client.

17

(d)     Conversion Commissions.

(i)     In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission as outlined in the Recruiter Commission Rate schedule of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies or (ii) the relevant employer-client is a Commissionable Client. The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion. All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)     The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From a Conversion of a Commissionable Clients credited to the EMPLOYEE for placements in permanent positions in accordance with the COMPANY's policies for crediting fees provided the placement fee is at 15% or greater. The commission rate will adjusted pro-rata or at the discretion of the COPMANY in the event the placement fee is lower than 15%.

Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period. The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)     "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee. In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

(iv)     The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (f)(ii) and (iii) above. In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

(e)     Permanent Placement Commissions.

(i)     The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From Permanent Placement Services from Commissionable Clients credited to the EMPLOYEE for placements in permanent paralegal positions in accordance with the COMPANY's policies for crediting fees.

(ii)     Commissions on Collections From Permanent Placement Services will not be earned or considered earned until the expiration of period of time during which, if the employment of the applicant terminates with the client who paid the fee, the COMPANY would be obligated to refund the fee or provide a credit, in whole or in part (the "Guaranty Period").  The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)    "Collections From Permanent Placement Services" shall mean, for the relevant period, fees generated and received by the COMPANY for the permanent placement of job candidates with Commissionable Clients, less any refunds, credits, fall-offs, discounts and/or other rebates given or owing to Commissionable Clients less any split fees or other payments or credits on or with respect to such fees paid or payable or owing at any time to other placement services or recruiters (which may be Affiliates of the COMPANY and shall be credited by the COMPANY and others in accordance with COMPANY's policies as in effect from time to time) and less legal fees, if any, expended to collect such receipts.

(iv)    The EMPLOYEE agrees that no commission on a particular placement shall be earned or considered earned until the completion of the conditions precedent set forth above in Subsections (d)(ii) and (iii) above.   In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned prior to the date of termination.

(v)     For purposes of clarification, the commissions referred to in this Section (c) assume that placement fees are at least fifteen percent (15%) for paralegals or at least twenty percent (20%) for attorneys of the placements first year base salary.  Commission rates will be adjusted pro-rata or at the discretion of the COMPANY in the event placement fees are less than 15% for paralegals or less than 20% for attorneys.

(f)     Conversion Commissions.

(i)     In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission of 5% of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies, or (ii) the relevant employer-client is a Commissionable Client and (iii) the sales revenue for the temporary placement was at a thirty-five percent (35%) or greater mark-up as defined by the COMPANY.  Commission rates will be adjusted pro-rata or at the discretion of the COMPANY for Sales revenue that is generated at less than a thirty-five percent (35%) mark-up.  The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion.  All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)    Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period.  The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

19

      (iii)   "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee. In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

      (iv)   The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (e)(ii) and (iii) above. In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

    (g)   **Advances.** Notwithstanding anything herein to the contrary, the COMPANY may, in its sole and absolute discretion, advance to the EMPLOYEE all or any portion of a commission on a placement prior to the expiration of the Guaranty Period or prior to the full receipt by the COMPANY of all of the fees or other amounts due and owing to it for the placements on which such commission is based. In such event, the COMPANY shall reduce the amount otherwise owed to the EMPLOYEE for the relevant placement by the amount of any advances made to the EMPLOYEE for such placement and shall recoup such advance or portion of such advance from any commission owed to the EMPLOYEE. In the event a commission has been advanced to the EMPLOYEE, in whole or in part, which the EMPLOYEE is not ultimately entitled, the EMPLOYEE agrees to immediately refund in full to the COMPANY any and all such unearned advances made to the EMPLOYEE by the COMPANY.

    (h)   **Changes to Compensation.** Notwithstanding anything herein to the contrary, commission rates and other compensation set forth herein may be changed at the sole discretion of the COMPANY at any time upon written notice to the EMPLOYEE which notice and change shall be effective for all revenues received, placements made and compensation earned after such notice.

    (i)   **Works In Progress.** EMPLOYEE shall not be entitled to: (A) a commission on any work in progress, meaning on any revenues received or client approved time billed by temporary employees after the termination of the EMPLOYEE's employment, or (B) a commission on any permanent placements where the commission has not yet been earned in accordance with the terms of this Agreement at the time of termination of EMPLOYEE's employment.

**EXHIBIT B**

## MOBILE DEVICE AND NON-CORPORATE COMPUTER ADDENDUM
## TO EMPLOYMENT AGREEMENT

This Information Technology Addendum ( the "IT Addendum") defines the standards, procedures, and restrictions applicable to Employee's use of mobile devices, including, but not limited to Blackberries, iPhones, iPads, smart phones or other such mobile devices Employee may use to access Company's network or conduct business on behalf of the Company (collectively, "**Mobile Devices**") and any computers, laptops, or tablets that are not issued by the Company that Employee may use to access Company's network or conduct business on behalf of the Company (collectively "**Non-Corporate Computers**"). This IT Addendum is intended to protect Company's technology-based resources, including computer and network systems, databases and other Confidential Information (collectively, "**Technology Resources**") and Company Data (as defined below) from unauthorized use or disclosure and/or a malicious attack resulting from Employee's use of a Mobile Device or Non-Corporate Computer. "**Company Data**" means all Company information, data and databases.

The Parties agree as follows:

1.     **Responsible Use**. Employee agrees to use Mobile Devices, Non-Corporate Computers, and Company Technology Resources appropriately, responsibly, ethically and in compliance with the Employment Agreement, Company's Information Processing Systems Policy, Employee Handbook, and the Confidentiality Agreement executed by the Parties. Employee is responsible for backing up all personal data contained on such devices. Company is not responsible for any personal data.

2.     **Password Requirements**. Employee shall maintain reasonable access control measures on Mobile Devices and Non-Corporate Computers, including, but not limited to, a power-on password as well as an inactivity-triggered password. Employee agrees to protect such passwords from unauthorized use and never share or disclose his/her passwords to anyone, other than as directed Company. Passwords may not be printed, stored online and if possible, must be comprised of a combination of letters and numbers which are not in a sequence or otherwise easy to decipher.

3.     **Responsibility for Data and Voice Fees**. The Employee acknowledges that the Employee is solely responsible for all fees for data and voice services associated with any Employee Company Device, except to the extent expressly agreed to by the Company.

4.     **Location and Disabling Requirements**. If available, Employee shall enable features on his/her Non-Corporate Computer and Mobile Device to enable Employee and/or the Company to locate lost or stolen equipment and/or to remotely disable such devices and/or disable access to any Company Data. If Employee needs assistance enabling such features, Company's IT Department will provide such assistance.

21

5.     **Anti-Virus Requirements**. Any Non-Corporate Computers used by Employee to synchronize with Employee's Mobile Device must utilize prevailing industry standard antivirus software and vice-versa.   The Company further recommends use of prevailing industry standard antivirus applications for any Mobile Devices and Non-Corporate Computers.  Please contact the Company's IT Department to the extent you have any questions regarding recommendations.

6.     **Registration with Company**.  Employee shall make known to the Company which Mobile Devices and Non-Corporate Computers Employee will be using in conjunction with Company Technology Resources. If applicable, Company's IT department may register, configure, and set-up Employee's Mobile Devices and Non-Corporate Computers.

7.     **Use Restrictions**.  Employee shall not:

    a.   make any modifications of any kind to software, if any, installed by Company on a Mobile Device or Non-Corporate Computer;

    b.   use any Company Technology Resources to load any pirated software or illegal content on to any Mobile Device or Non-Corporate Computer;

    c.   use a Mobile Device or Non-Corporate Computer to make unauthorized disclosure of Company Data; or

    d.   use a Mobile Device or Non-Corporate Computer to violate or attempt to violate any local, state, federal or international law.

    e.   use Company Technology Resources for any purpose other than Company business purposes.

8.     **Segregation of Company Email From Personal Communications**.  Employee agrees to be cautious about the merging of personal and work email accounts, calendars, task lists or other applications on a Mobile Device or Non-Corporate Computer.  Employee will take particular care to ensure that Company Data is only sent through the Company's email system and is segregated from personal data.

9.     **Downloading/Storage of Company Data to Mobile Devices or Non-Corporate Computer; Remote Access of Company Files and Systems**. Company Data may not be downloaded to a Mobile Device or Non-Corporate Computer for any non-work related purposes. The storage of such data could compromise the confidentiality of such Company Data and therefore is not permitted.  For example, Employee may not save and store email attachments for access locally on a Mobile Device or Non-Corporate Computer but shall instead access such documents via the Company email system or other Company Technology Resources. Notwithstanding the foregoing, Employees may only access the Company's computer files, systems and other Technology Resources upon the prior written consent of the Officer of the Company and on such terms and conditions as set forth by the Officer.

10. **Reporting Lost or Stolen Devices or Other Incidents**. Employee shall immediately report to his/her supervisor and Company's IT Department: (a) any lost or stolen Mobile Device or Non-Corporate Computer or (b) any incident or suspected incident of unauthorized access of Company's networks and/or unauthorized disclosure of Company Data. Employee agrees to reasonably cooperate with Company to protect any Company Data and/or remedy any incident.

11. **Company Right to Monitor; No Expectation of Privacy**. Employee agrees and acknowledges that, except as prohibited by law, Company may (but is not obligated to) monitor, record, and review Employee's communications in connection with Company Technology Resources, including access to Company's networks and resources, including, without limitation, the dates, times, and duration of Employee's access to the Company's network. Employee acknowledges that he/she shall have no expectation of privacy in anything that he/she creates, stores, sends or receives on or through the Company Technology Resources by use of any Mobile Device or Non-Corporate Computer. Company does not anticipate monitoring its Technology Resources absent a legitimate business purpose, including, e.g., investigating possible theft or espionage, monitoring work flow, retrieving missing Company Data, evaluating compliance with Company policies, and so forth.

12. **Confidentiality of Company Data**. The Parties agree and acknowledge all Company Data accessed or stored on the Employee's Mobile Device or Non-Corporate Computer shall be deemed to be Company Confidential Information for the purposes of the Employment Agreement and Confidentiality Agreement.

13. **Deletion of Company Data Upon Termination of Employment**. Upon the earlier of Company's request or Employee's termination of employment with Company, Employee shall provide Company with access to Employee's Mobile Device or Non-Corporate Computer in order to allow Company to delete or otherwise remove Company Data from Employee's Mobile Device or Non-Corporate Computer.

14. **Compliance with Applicable Laws**. All Employees must comply with all applicable software licenses, copyrights, and other national/federal, state and international laws and regulations governing intellectual property, online activities, and data protection.

15. **Disclaimer of Liability**. COMPANY ASSUMES NO LIABILITY FOR LOSS, DAMAGE, DESTRUCTION, ALTERATION, DISCLOSURE, OR MISUSE OF ANY PERSONAL DATA OR COMMUNICATIONS TRANSMITTED OVER OR STORED ON A MOBILE DEVICE OR NON-CORPORATE COMPUTER. COMPANY ACCEPTS NO RESPONSIBILITY OR LIABILITY FOR THE LOSS OR NON-DELIVERY OF ANY PERSONAL ELECTRONIC MAIL OR VOICEMAIL COMMUNICATIONS OR ANY PERSONAL DATA STORED ON ANY MOBILE DEVICE OR NON-CORPORATE COMPUTER. EMPLOYEE EXPRESSLY ACKNOWLEDGES AND AGREES TO RELEASE COMPANY FROM ANY AND ALL CLAIMS, INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S ACCESS TO EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS,

23

INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S DELETION OF EMPLOYEE'S PERSONAL DATA OR INFORMATION ON EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER.

16.    **Penalty for Violations**. The Parties agree and acknowledge that Employee's violation of the terms of this IT Addendum may result in disciplinary action, including but not limited to termination of employment.

17.    **Entirety**. This IT Addendum, together with the Employment Agreement, Company's Information Processing Systems Policy, Employee Handbook and the Confidentiality Agreement executed by the Employee represents the entire agreement between the parties with respect to the subject matter hereof.

KC

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

**HIRECounsel DC, LLC**
1220 K Street, N.W., Suite 400
Washington, D.C.  20006

**Plaintiff,**

v.

**KILIAN CONNOLLY**
10 Brooks Court
Boston, MA  01950

**Defendant.**

Case No.  2020 CA 004508 B

**COMPLAINT**

# EXHIBIT D

September 29, 2020 Letter to Beacon Hill

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
*Attorneys at Law*
1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:   202-887-0866
www.ogletree.com

Ogletree
Deakins

Michael J. Murphy
202-263-0250
michael.murphy@ogletree.com

September 29, 2020

**By Facsimile**

Andrew Wang
Chief Executive Officer
John David Tarbox
Managing Director and EVP, BH Legal
Beacon Hill Staffing Group
152 Bowdoin Street
Boston, Massachusetts  02108

Re:   <u>Kilian Connolly – Post-Employment Obligations with HIRECounsel</u>

Dear Mr. Wang and Mr. Tarbox:

This law firm represents HIRECounsel DC, LLC ("HIRECounsel," or the "Company"). I write to you concerning certain post-employment contractual obligations that Kilian Connolly owes to HIRECounsel. We understand that Mr. Connolly is now employed by your company, Beacon Hill Staffing Group ("BHSG") as a Senior Account Executive in the legal specialty division, providing the same legal staffing and document review services he provided for HIRECounsel.  On September 23, 2020, we notified Mr. Connolly that HIRECounsel believed that his employment with your company at your Boston office violates his post-employment contractual obligations.  We also notified Mr. Connolly that we have reason to believe that prior to his resignation from HIRECounsel, he misappropriated highly confidential and proprietary information of HIRECounsel. We have notified Mr. Connolly that HIRECounsel expects him to cease and desist from these contractual violations immediately, to return any and all confidential and proprietary information he has misappropriated, and have requested written assurances to that effect.  Absent these written assurances, HIRECounsel has authorized this firm to commence legal proceedings against Mr. Connolly to enforce his post-employment contractual obligations in Washington, D.C., pursuant to the venue provision in the Agreement.

For your reference, enclosed is a copy of Mr. Connolly's Employment Agreement (the "Agreement") with HIRECounsel.  In that Agreement, Mr. Connolly agreed that for a period of

---

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

September 29, 2020
Page 2

twelve (12) months following the termination of his employment with the Company (the "Restricted Period"), he will not, directly or indirectly,

- solicit, divert or appropriate, or attempt to solicit, divert or appropriate, to any Competing Business any person or entity who was a client of the Company or any of its Affiliates and with whom he worked or had any contact while employed by the Company at any time during the twelve (12) month period preceding the termination of the Agreement or of his ceasing to be an employee of the Company;

- fill or attempt to fill a job order or assignment which was obtained and pending with the Company or any of its Affiliates at the time of his ceasing to be an employee of the Company;

- solicit, divert or hire away for or on behalf of any Competing Business, or attempt to solicit, divert or hire away for or on behalf of any Competing Business, including, without limitation, hiring or engaging as an employee or independent contractor any person employed by the Company or any of its Affiliates, at any time during the twelve (12) months preceding his ceasing to be an employee of the Company;

- contact, circularize or communicate with, in any manner, directly or indirectly, any of the Company's or any of its Affiliates' applicants for permanent or temporary employment or temporary employees who were such at the time of his termination or within twelve (12) months prior thereto;

- contact, circularize or communicate with, in any manner, directly or indirectly, any clients or potential clients of the Company or any of its Affiliates who he contacted or communicated with on behalf of the Company or any of its Affiliates at any time within the twelve (12) months prior to the date of his ceasing to be an employee of the Company;

- directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the Company or any of the Company's Affiliates, at which he is or was employed, performed services or engaged or assisted in the business or operations of the Company or any of its Affiliates; or

- directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the Company or any office of any of its Affiliates.

*See* Agreement, Section 5(a)(i)-(iv), (vii)-(viii). The Agreement defines the term "Competing Business" as any "business which is either engaged in permanent or temporary placement or the same or substantially the same business of the C[ompany] or any of its Affiliates." *See id.*, Section

September 29, 2020
Page 3

5(a)(i). Mr. Connolly also agreed, among other things, that the twelve-month Restricted Period would be extended by the length of time during which he is in breach of your non-solicitation and non-competition obligations. *See id.*, Section 5(b).

In addition to these non-competition and non-solicitation restrictions, Mr. Connolly agreed to contract provisions that bar him from using or disclosing HIRECounsel's confidential information and trade secrets. In particular, he agreed that during and after his employment with the Company, he would "not use, disclose, copy or retain or remove from the C[ompany]'s premises any confidential or proprietary information or trade secrets." *See* Agreement, Section 4(b). The confidential or proprietary information and trade secrets ("Confidential Information") that are protected by this provision include, without limitation, "lists and information pertaining to clients or client contacts, job applicants, referrals, and employees, and all other ideas, methods, procedures, techniques, written material, and other know-how, developed or used in connection with the C[ompany]'s or any of its Affiliates' business belonging to the C[ompany] or any of its Affiliates," as well as "the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and resumes of all persons who have applied to or been recruited by the C[ompany] or any of its Affiliates for employment or placement and job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the C[ompany] and its Affiliates, not generally available to others," and "all information contained or stored in the confidential databases of the C[ompany] and its Affiliates." *See id.* As a trusted and high-level employee of HIRECounsel, Mr. Connolly was provided with and exposed to a vast quantity of its Confidential Information, including in particular Confidential Information about the Company's clients, accounts, operations, processes, methods, business plans, margins and mark-ups, and strategies.

All of the above-referenced provisions of Mr. Connolly's Agreement with HIRECounsel are designed to protect the legitimate interests of HIRECounsel and may be enforced through legal action, if necessary. There is no question that BHSG, and in particular, its legal specialty division, falls directly within the scope of competitive businesses for whom Mr. Connolly may not perform services during the 12-month Restricted Period under the plain terms of his Agreement with HIRECounsel. Likewise, there is no question that Mr. Connolly has had access, in connection with his duties as a HIRECounsel employee, to the Company's most highly sensitive confidential and proprietary information and trade secrets, and it appears that Mr. Connolly has misappropriated such highly confidential and proprietary information prior to his resignation.

HIRECounsel has invested significant time and monetary resources in its business. Because of the importance of these matters to HIRECounsel, it requests that BHSG take appropriate measures to ensure that it does not participate in or facilitate Mr. Connolly's violation of his contractual and other obligations to the Company, including but not limited to, by permitting him to perform legal staffing and document review services similar to those he performed for HIRECounsel in its Boston office (or in its Washington, D.C. or New York offices, and 75 miles thereof) during the twelve-month Restricted Period. While HIRECounsel hopes that it and BHSG can avoid litigation of this matter, it reserves all of its rights, including but not limited to the right to

September 29, 2020
Page 4


assert claims of tortious interference with contractual or advantageous business relations, should the parties be unable to resolve this matter satisfactorily.

In light of the seriousness of this matter, I urge you to have your legal counsel contact me immediately.

Very truly yours,

Michael J. Murphy


Enclosure

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of _____, by and between HIRECounsel DC, LLC, a District of Columbia limited liability company with an office at 1901 L Street, N.W., Washington, DC   20036 (the "COMPANY"), and Kilian Connolly, an individual residing at 10 Brooks Court, Boston, MA 01950 (the "EMPLOYEE").

**WHEREAS**, the COMPANY, together with its Affiliates (as hereinafter defined) is engaged in business in New York, NY; Los Angeles, CA; Boston, MA; Washington, D.C.; San Francisco, CA; Chicago, IL; Houston, TX; Miami, FL; Stamford, CT; Atlanta, GA; Philadelphia, PA; Kansas City, MO, Newark, NJ, Austin, TX, St. Louis, MO., Richmond, VA, Stamford, CT; and elsewhere as a permanent and temporary staffing service, specializing in the placement of attorneys, paralegals and legal support staff, including, but not limited to, coders and review management for legal services;

**WHEREAS,** the COMPANY and EMPLOYEE desires to employ the EMPLOYEE, and the EMPLOYEE desires to accept employment on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the employment of the EMPLOYEE by the COMPANY, the above premises and the agreements hereinafter set forth, the parties agree as follows:

    1.   Nature of Employment.

        (a) The COMPANY shall employ the EMPLOYEE and the EMPLOYEE accepts such employment with the COMPANY, upon the terms and subject to the conditions contained herein, as a Managing Director of Client Relations, responsible for:  (i) marketing the services of the COMPANY to clients and potential clients in the Territory, which may include preparing proposals and pitching business; (ii) soliciting, obtaining business from and providing services to employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to coders; (iii) developing and maintaining relationships with employer-clients in the Territory, which may include coordinating meetings with clients and potential clients to explore potential new business and follow-up on existing business; (iv) fostering good relations with clients in the Territory; (v) supervising the COMPANY's job posting process with respect to open assignments that are potentially commissionable to EMPLOYEE in accordance with Exhibit A; (vi) recruiting, soliciting and providing services to

employer-clients in the Territory needing temporary paralegals, attorneys and legal support staff, including, but not limited to, coders; (vii) recruiting, soliciting, interviewing and referring job candidates to employer-clients in the Territory; (viii) effecting the placement of job candidates with employer-clients in the Territory, which may include handling details and arrangements with respect to leased project work space, coordination of information technology issues and acting as a liaison between recruiters and clients; and (ix) engaging in such other duties and responsibilities as are consistent with the foregoing or assigned by the President of the Managing Member of the COMPANY (the "President") or the Chief Operating Officer of the Managing Member of the COMPANY (the "COO"). The "Territory" shall mean Boston, MA and the general surrounding areas. In addition Employee may conduct targeted marketing in Washington, DC and New York City and any other areas designated by the President, COO or Sales Manager. EMPLOYEE's employment shall commence as of _Feb 2_____, 2015 (the "Commencement Date"), and continue until terminated as set forth herein.

(b) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to obtain the consent of the President or Chief Operating Officer, or National Managing Director of Sales of the COMPANY in writing or by e-mail prior to accepting any agreement or job order on behalf of the COMPANY or any of its Affiliates to provide temporary services on which the Mark-Up Percentage is less than sixty percent (60%). "Mark-Up Percentage" shall mean a percentage calculated as: (i) the aggregate anticipated rate per hour at which the relevant employer-client shall be billed less the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, divided by (ii) the aggregate anticipated rate per hour at which the relevant temporary employees performing services for such employer-client shall be paid, and then multiplied by (iii) 100%. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

(c) EMPLOYEE agrees and acknowledges that EMPLOYEE is required to conduct and complete any and all protocols associated with billing and collections, including but not limited to client vetting for new and existing customers. The EMPLOYEE shall have no authority to negotiate or accept and the COMPANY and its Affiliates shall have no obligation to

2

place temporary employees pursuant to any agreement or job order negotiated or accepted by EMPLOYEE in breach of this Subsection.

   2. Compensation, Expenses, Benefits, Vacation.

   (a)   As compensation for his services during the term of his employment with the COMPANY, the COMPANY shall pay the EMPLOYEE compensation as described on Exhibit A attached hereto and made a part hereof.

   (b)   The EMPLOYEE shall be entitled to reimbursement for reasonable travel, entertainment and other out-of-pocket expenses necessarily incurred in the performance of EMPLOYEE's duties hereunder, under submission and approval of written statements and bills in accordance with the then regular policies and procedures of the COMPANY.

   (c)   The EMPLOYEE shall be entitled to such other benefits offered by the COMPANY to employees with comparable duties and responsibilities as those of the EMPLOYEE, in accordance with the then regular procedures of the COMPANY governing employees as determined from time to time by the COMPANY. EMPLOYEE shall be entitled to participate in the group health insurance plan maintained by the COMPANY. Any and all benefits are subject to the applicable plan documents and may be amended, modified or terminated by the COMPANY or the applicable provider at any time.

   (d)   The EMPLOYEE shall be entitled to vacation and other leave in accordance with the COMPANY's policies applicable to comparable employees generally. The EMPLOYEE shall be entitled to three (3) weeks of vacation and five (5) personal or sick days for each twelve (12) months of employment, provided that during the first six (6) months after the Commencement Date the EMPLOYEE may not take more than two (2) consecutive days off other than for health reasons. The EMPLOYEE shall not be entitled to payment for unused personal or sick days upon the termination of EMPLOYEE's employment.

   (e)   The COMPANY may provide EMPLOYEE with access to company systems and email in accordance with the Mobile Device and Non-Corporate Computer Policy in Exhibit B.

   (f)   EMPLOYEE will be paid all compensation through the COMPANY's current parent company HC2, Inc. This is a payrolling arrangement and does not affect the terms

3



of this Agreement. The EMPLOYEE is an employee of the COMPANY and not an employee of HC2, Inc.

   3.  <u>Termination of Employment</u>.

      (a) The EMPLOYEE's employment pursuant to this Agreement shall continue until terminated by the EMPLOYEE or the COMPANY by giving notice to the other for any reason or no reason.

      (b) This Agreement is not intended to and shall not be construed as creating a contract guaranteeing employment for any specified duration and either the EMPLOYEE or the COMPANY may end the employment relationship at any time with or without cause or for no cause.

   4.  <u>Confidential Information and Trade Secrets</u>.

      (a) During the term of this Agreement the EMPLOYEE shall devote EMPLOYEE's reasonable best efforts and entire business time and energy to the performance of EMPLOYEE's duties and shall perform EMPLOYEE's duties to the best of EMPLOYEE's abilities. The EMPLOYEE shall not, during the term hereof, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others, actively engage in any other business, enterprise or undertaking, or prepare for, undertake or discuss with any other employees of the COMPANY, or any of its Affiliates, any business or professional employment of any kind, whether within the personnel or staffing industries or otherwise. For purposes of this Agreement "Affiliates" shall mean all successors, affiliates, subsidiaries and parents of the COMPANY, including, but not limited to, HC2, Inc.; HIRECounsel New York, LLC; HIRECounsel DC, LLC; Mestel & Company New York, LLC; Mestel & Company Chicago, LLC; The WOB Company, Inc.; Mestel & Company D.C., LLC; Mestel and Company Boston, LLC; Mestel & Company Miami, LLC; Mestel & Company Houston, LLC; Mestel & Company Los Angeles, Inc.; HIRECounsel Chicago, LLC; HIRECounsel Houston, LLC; HIRECounsel Miami, LLC; HIRECounsel Connecticut, LLC; HIRECounsel Atlanta, LLC; and HIRECounsel Philadelphia, LLC.

      (b) During and after EMPLOYEE's employment with the COMPANY, the EMPLOYEE agrees that EMPLOYEE will not use, disclose, copy or retain or remove from the COMPANY's premises any confidential or proprietary information or trade secrets, including, but not limited to, lists and information pertaining to clients and client contacts, job applicants, referrals,

4



and employees, and all other ideas, methods, procedures, techniques, written material, and other know-how, developed or used in connection with the COMPANY's or any of its Affiliates' business belonging to the COMPANY or any of its Affiliates (collectively, "Confidential Information"), other than for use in connection with authorized work performed for the COMPANY or such Affiliates. Confidential Information shall also include, but not be limited to, the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability and résumés of all persons who have applied to or been recruited by the COMPANY or any of its Affiliates for employment or placement and job order specifications and the particular characteristics and requirements of persons generally hired by a client, as well as specific job listings, mailing lists, computer runoffs, financial and other information of the COMPANY and its Affiliates, not generally available to others. Confidential Information shall also include all information contained or stored in the confidential databases of the COMPANY and its Affiliates containing Confidential Information or other information of the COMPANY or its Affiliates (the "Confidential Database").

(c) The EMPLOYEE agrees that upon request by the COMPANY and in any event upon termination of employment, the EMPLOYEE shall turn over to the COMPANY all documents, papers or other material, including all copies thereof, in any form including electronic and hard copy, in EMPLOYEE's possession or under EMPLOYEE's control which may constitute, contain or be derived from Confidential Information, together with all documents, notes or other work product which is connected with or derived from the EMPLOYEE's services to the COMPANY whether or not such material is at the date hereof in the EMPLOYEE's possession.

(d) The Confidential Database is the property of and confidential to the COMPANY and its Affiliates and represents valuable, special and unique assets of the COMPANY, access to and knowledge of which are essential to EMPLOYEE's duties hereunder. EMPLOYEE shall take all precautions necessary to safeguard all Confidential Information and/or information contained in or derived from the Confidential Database against unauthorized use or reproduction by third parties. Neither anything contained in this Section 4 nor EMPLOYEE's being given permission to access the Confidential Database from inside or outside the COMPANY's premises shall be deemed a waiver by the COMPANY of any of the restrictions and provisions contained herein.

5



(e) EMPLOYEE agrees that he shall not, and acknowledges that he is prohibited from, working or in any way collaborating with any third party either while employed by the COMPANY or following the termination of her employment with the COMPANY for any reason for any commercial or non-commercial purpose utilizing any Confidential Information.

(f) During the term of this Agreement, Employee agrees that he will not, directly or indirectly, own and interest in, operate, join, control, participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, or other entity which directly or indirectly competes with the COMPANY, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange.

5. Non-Competition

(a) EMPLOYEE agrees that during the term of this Agreement and for a period of twelve (12) months following EMPLOYEE ceasing to be an employee of the COMPANY, EMPLOYEE will not, without the prior written consent of the COMPANY, either directly or indirectly, on EMPLOYEE's own behalf or in the service or on behalf of others:

(i) solicit, divert or appropriate, or attempt to solicit, divert or appropriate, to any business which is either engaged in permanent or temporary placement or the same or substantially the same business of the COMPANY or any of its Affiliates (a "Competing Business"), any person or entity who is a client of the COMPANY or any of its Affiliates and with whom the EMPLOYEE worked, or had any contact while employed by the COMPANY, or whom EMPLOYEE would have been reasonably aware of as a client of the COMPANY at any time during the twelve (12) month period preceding the termination of this Agreement or of the EMPLOYEE's ceasing to be an employee of the COMPANY, or fill or attempt to fill, a job order or assignment which was obtained and pending with the COMPANY or any of its Affiliates, at the time of the EMPLOYEE's ceasing to be an employee of the COMPANY;

(ii) solicit, divert or hire away for or on behalf of any Competing Business, or attempt to solicit, divert or hire away for or on behalf of any Competing Business, including, without limitation, hiring or engaging as an employee or independent contractor any person employed by the COMPANY or any of its Affiliates, at any time during the twelve (12) months preceding EMPLOYEE ceasing to be an employee of the COMPANY, whether as a

6

temporary or permanent employee of the COMPANY and whether or not such employment by the COMPANY is or was pursuant to a written agreement and whether or not such employment by the COMPANY is or was for a determined period or is or was at will and whether or not the employee applied to a position with a Competing Business;

(iii) contact, circularize or communicate with, in any manner, directly or indirectly, any of the COMPANY's or any of its Affiliates' applicants for permanent or temporary employment or temporary employees who were such at the time of the EMPLOYEE's termination or within twelve (12) months prior thereto whether or not the employee applied to a position with a Competing Business;

(iv) contact, circularize or communicate with, in any manner, directly or indirectly, any clients or potential clients of the COMPANY or any of its Affiliates who EMPLOYEE contacted or communicated with on behalf of the COMPANY or whom EMPLOYEE would have been reasonably aware of was a client of the COMPANY or any of its Affiliates at any time within the twelve (12) months prior to the date of EMPLOYEE ceasing to be an employee of the COMPANY;

(v) purchase, license, use or employ to use in any manner directly or indirectly any proprietary legal, attorney or paralegal, executive search computer software program utilized by the COMPANY, excluding any computer software programs utilized by any subsequent employer of the EMPLOYEE or any entity with which the EMPLOYEE becomes associated, prior to the EMPLOYEE's joining such employer or entity;

(vi) accept employment with an employer which employs any person who is at such time or was within the twelve (12) month period prior thereto an employee of the COMPANY or any of its Affiliates, excluding employees of the COMPANY and its Affiliates who are placed as temporary employees with employer-clients; or

(vii) directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any of the COMPANY's Affiliates, at which the EMPLOYEE is or was employed, performed services or engaged or assisted in the business or operations of the COMPANY or any of its Affiliates; or

7



(viii)  directly or indirectly engage in, be employed by, own, manage, operate, control, participate in or be connected in any manner with the ownership, management, operation or control of any Competing Business within seventy-five (75) miles of any office of the COMPANY or any office of any of its Affiliates.

(b) In the event of a breach of any of the covenants set forth in this Section 5, the running of the period of the restriction shall be tolled during the continuation of any such breach, and the running of the period of such restrictions shall resume only upon compliance with the terms of the applicable subparagraph.

(c) The EMPLOYEE agrees that each of EMPLOYEE's agreements set forth in this Agreement is reasonable and necessary to protect and preserve the business, interests and properties of the COMPANY and its Affiliates. In the event of a breach of any of the EMPLOYEE's covenants in this Agreement, the COMPANY and its Affiliates, shall be entitled to both temporary and permanent injunctions to prevent a breach or contemplated breach of any of the EMPLOYEE's covenants in this Agreement. The COMPANY also retains the right to seek other relief, including damages, which shall be the greater of the amount of the financial loss which the COMPANY and its Affiliates suffer as a result of a breach by the EMPLOYEE or the amount of the financial gain which the EMPLOYEE and any person or entity with whom the EMPLOYEE is associated, receives as a result of a breach by the EMPLOYEE. It is hereby provided that in the event of a breach by the EMPLOYEE of Section 3 or 5 of this Agreement, any Affiliate of the COMPANY has a right to seek relief for such breach as if such Affiliate was a party to this Agreement.

(d) If any court of competent jurisdiction shall determine any covenant set forth herein is unenforceable, then such covenant shall not be terminated but shall be deemed amended by substituting in its place and stead such restrictions as the court may deem reasonable under the circumstances or by striking the unenforceable language of the covenant, leaving the enforceable remainder; and all other provisions of this Agreement shall survive such determination and shall inure to the benefit of the COMPANY and its Affiliates and their successors and assigns. If any clause or provision of this Agreement is held to be excessively broad, that provision shall thereafter be deemed limited in scope and application only to the extent necessary to preserve its enforceability under the law. If any provision of this Agreement is held entirely unenforceable, that provision shall be deemed severed herefrom, and the remaining provisions of this Agreement shall be enforceable and shall be construed independent of that provision.

8

(e) The EMPLOYEE recognizes that the COMPANY has and will be making a significant investment of resources, financial and otherwise, into the success of the COMPANY and recognizes and agrees that the value of Confidential Information is, and the damage to the COMPANY caused by the EMPLOYEE's violation of any of the covenants and agreements contained in Sections 3 and 5(a) will be, significant and difficult to ascertain. It is therefore agreed that the COMPANY shall be entitled as payment from the EMPLOYEE and any person or entity involved in the violation of any of the provisions of Section 3 or 5(a) as a fair and reasonable estimate of the liquidated damages and not as a penalty the greater of: (i) the sum of forty thousand dollars ($40,000); and (ii) for each calendar week or part thereof that such violation continues, a sum equivalent to the greater of (A) one fifty-second ($1/52$) of the EMPLOYEE's total compensation from the COMPANY during the twelve (12) months before the initial date of the violation and (B) the gross commissions attributable to the EMPLOYEE's direct or indirect efforts during such calendar week of the violation. Any violation of Section 3 or 5(a) shall be deemed to continue for as long as the EMPLOYEE utilizes Confidential Information or continues to engage in business or transact business with any client, applicant for employment, temporary employee, former employee or independent contractor of the COMPANY or any of its Affiliates in violation of this Agreement.

(f) If the EMPLOYEE was not employed by the COMPANY for the full prior twelve (12) month period then the amount in Subpart (e)(ii)(A) above shall be a sum determined by dividing the total compensation received by the EMPLOYEE from the COMPANY, by the number of weeks the EMPLOYEE was employed by the COMPANY.

(g) The remedies contained herein are not exclusive, but are cumulative and the COMPANY may pursue any and all other relief available to it in equity or in law.

(h) After termination of the EMPLOYEE's employment with the COMPANY, the EMPLOYEE shall not indicate on any stationery, business card or advertising, solicitation or other business materials that EMPLOYEE was formerly an employee of the COMPANY or any Affiliate, division or subsidiary of the COMPANY except in the bona fide submission of résumés and the filling out of applications in the course of seeking employment.

6. Patents; Copyrights. Any interest in patents, patent applications, inventions, trademarks, trade dress, trade secrets, copyrights, developments and process (collectively "Inventions") which the EMPLOYEE, during EMPLOYEE's employment with the COMPANY, may own or develop

9

which specifically enhances the business of the COMPANY shall belong to the COMPANY; and forthwith upon request of the COMPANY, the EMPLOYEE shall execute all such assignments and other documents and take all such other action as the COMPANY may reasonably request in order to vest in the COMPANY all of EMPLOYEE's right, title, and interest in and to such Inventions, free and clear of all liens, charges and encumbrances.

 7.  Representations, Warranties and Covenants of EMPLOYEE.

 (a) The EMPLOYEE confirms to the COMPANY that EMPLOYEE is free to enter the COMPANY's employ and has made no agreement and has no obligation inconsistent with unrestrained employment with the COMPANY other than the employment agreement EMPLOYEE entered into with his former employer Trustpoint Interntational, LLC and its successors or assigns ("Trustpoint"), dated as of March 29, 2011, (the "Trustpoint Agreement").

 (b) The EMPLOYEE represents, warrants and covenants that the EMPLOYEE: (i) has not told or communicated to, and shall not tell or communicate to, any client, candidate or employee of or any other person associated with EMPLOYEE's prior employer that EMPLOYEE is leaving to be employed by the COMPANY prior to the Commencement Date; (ii) is not in violation of, and shall not violate, any written or oral agreement that EMPLOYEE is a party to by entering the employ of the COMPANY; (iii) has not copied or physically retained, and will not copy or physically retain, any document of any of EMPLOYEE's former employers; (iv) has not purposefully memorized, and will not purposefully memorize, any confidential customer lists or trade secrets of any of EMPLOYEE's former employers; and (v) has not solicited, and will not solicit, any clients, employees or candidates of any former employer prior to the termination of EMPLOYEE's employment with that employer other than on behalf of such former employer. The EMPLOYEE acknowledges that EMPLOYEE may not directly solicit job candidates of any prior employer after the Commencement Date, except based upon information obtained independent of such prior employment.

 (c) EMPLOYEE represents and warrants that there exists no other agreement between him and TRUSTPOINT other than the TRUSTPOINT Agreement. EMPLOYEE expressly acknowledges that in the event any lawsuit is brought, or as determined by the COMPANY in the COMPANY's discretion, may be brought, against EMPLOYEE and/or the COMPANY or any of its Affiliates by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY

10

may terminate EMPLOYEE's employment immediately without any liability to EMPLOYEE other than for amounts earned by, but not yet paid to, EMPLOYEE as of the termination date. The EMPLOYEE acknowledges he is an employee at-will and agrees that he will have no claim against the COMPANY or any of its Affiliates as a result of such termination. Nothing contained in this Agreement is intended in any way to abrogate the employment at-will relationship between the EMPLOYEE and the COMPANY. The EMPLOYEE agrees that in the event any lawsuit is brought against EMPLOYEE by TRUSTPOINT or any of its affiliates with respect to any breach or alleged breach by EMPLOYEE of the TRUSTPOINT Agreement, the COMPANY shall in no way be responsible for his resulting attorneys' fees or other legal costs and the EMPLOYEE shall not seek to join the COMPANY in any such lawsuit.

(d) The EMPLOYEE hereby agrees to indemnify and hold the COMPANY harmless from all costs, expenses, judgments and reasonable attorneys' fees incurred in connection with any legal proceeding commenced against the COMPANY or any of its Affiliates based upon a breach of any of the representations, warranties and covenants contained in this Section 7. The COMPANY may offset against any sums due to the EMPLOYEE, any amount due to the COMPANY by reason of the foregoing indemnity and any damages sustained by the COMPANY or any of its Affiliates by reason of a breach of any of the foregoing representations, warranties and covenants.

(e) Notwithstanding section 7(c)-(d), the COMPANY shall indemnify EMPLOYEE from and against any and all costs of defense, judgments, fines and amounts in settlement suffered by the EMPLOYEE if EMPLOYEE becomes a party to any claim, suit, action or other legal proceeding by his/her former employer relating specifically to the Employee acting in the scope of his/her employment with the COMPANY and consistent with the express instruction given by the President or COO of the COMPANY. EMPLOYEE shall have an affirmative duty to disclose potential activities to the President or COO that would violate his former employment agreement and give rise to a legal proceeding. Such indemnification shall not extend to any such claims brought by EMPLOYEE's former employer for willful misconduct, criminal or other negligent act which arose during the course of Employee's former employment, nor shall such indemnification cover any act not related to EMPLOYEE acting within the scope of his employment with the COMPANY, nor in the event that EMPLOYEE did

11

not timely disclose information to the President or COO which caused the President or COO to instruct EMPLOYEE to conduct himself in a manner that gave rise to the legal proceeding.

8. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to conflicts of law principles.

9. <u>Entire Agreement</u>. This Agreement herewith embodies the entire agreement and understanding by and between the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to the employment of the EMPLOYEE by the COMPANY or any of its Affiliates.

10. <u>Notice</u>. Any notice required to be given under this Agreement shall be in writing and delivered by certified mail, return receipt requested to the parties at their addresses set forth above or any other address given by a party to the other in accordance with this Section.

11. <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either of the parties hereto without the prior written consent of the other party, except the COMPANY may assign this Agreement or any of the rights, interests or obligations hereunder to any of its Affiliates or any successor to all or a portion of its business without prior written consent from the EMPLOYEE. This Agreement is not intended to confer upon any person except the parties and the COMPANY's Affiliates any rights or remedies hereunder.

12. <u>Waiver</u>. The waiver of any breach of this Agreement by any party at any time shall not be effective unless in writing, and no such waiver shall constitute the waiver of the same or another breach on a subsequent occasion. Moreover, no delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.

13. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

14. <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

12

15. Modification.  Neither this Agreement, nor any of its provisions, may be changed, modified or cancelled except by mutual written consent of all the undersigned.

16. Severability.  If any of the provisions of this Agreement are or become unenforceable, the remainder of this Agreement shall nevertheless remain binding to the fullest extent possible, taking into consideration the purposes and spirit of this Agreement.

17. Survival.  The covenants, agreements, representations and warranties contained in or made pursuant to this Agreement shall survive the termination of the EMPLOYEE's employment by the COMPANY, irrespective of any investigation made by or on behalf of any party.

18. Arbitration.

(a) Except as provided in Subsection 18(b), any dispute arising out of this Agreement shall be settled by arbitration before a panel of three (3) arbitrators in Washington, D.C., in accordance with the employment arbitration rules then obtaining of the American Arbitration Association or its successor.  The parties hereto agree that any judgment, settlement or award rendered pursuant to such arbitration shall be a final and binding determination as to the matters described therein, and a judgment of any federal, state or other court of competent jurisdiction shall be entered upon the award made pursuant to the arbitration.  Each of the parties hereto hereby consents to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding in connection with any proceeding to enforce or in connection with any such arbitration.  Each of the parties hereto waives any objection that it may have to the conduct of any such action or proceeding in any such court based on improper venue or forum non conveniens, waives personal service of any and all process upon it and consents that all service of process may be made by mail or courier service directed to it at the address set forth in this Agreement and that service so made shall be deemed to be completed upon the earlier of actual receipt or four (4) days after the same shall have been posted.  Nothing contained in this Subsection shall affect the right of any party hereto to enforce any judgment obtained in a court of competent jurisdiction in any other court or serve legal process or in any other manner permitted by law.

(b) EMPLOYEE acknowledges that a breach of Section 4 or 5 would cause irreparable injury to the COMPANY and to the COMPANY's Affiliates.  Therefore, EMPLOYEE agrees that upon a breach or anticipated breach of Section 4 or 5 the COMPANY

13

shall have the immediate right to secure a court order enjoining any such breach. This covenant shall be independent and severable and shall be enforceable notwithstanding any other rights or remedies that either party may have. The parties consent to the exclusive jurisdiction of the Superior Court of the District of Columbia and the United States District Court for the District of Columbia for all purposes in connection with any legal proceeding resulting from any breach or anticipated breach of Section 4 or 5 by the EMPLOYEE.

19. Costs. The parties agree that in the event it becomes necessary for the COMPANY to seek judicial or arbitration remedies for the breach or threatened breach of this Agreement, the COMPANY shall be entitled, in addition to all other remedies, to recover from EMPLOYEE all of its costs arising as a result of such action or arbitration, including reasonable attorneys' fees and all such costs related to any appeal.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the Commencement Date.

HIRECOUNSEL DC, LLC

By: _____

Name: Willa Fawer
Title: Chief Operating Officer

_____

**Kilian Connolly**

14

## EXHIBIT A

(a) **Salary.**  EMPLOYEE shall be entitled to an annual salary at the rate of $75,000 per year, to be paid in equal periodic installments, plus commissions as set forth below.  All salary and other amounts payable to EMPLOYEE shall be paid less applicable taxes and withholdings and in accordance with the COMPANY's regular payroll practices.

(c)    Temporary Placement Commissions for Sales

(i)    Base Sales Commission Rate.  In the event the EMPLOYEE is solely responsible without assistance for bringing to the COMPANY an employer-client, who has not given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior thereto (a "Commissionable Client"), the EMPLOYEE shall be entitled to receive a commission based upon a sliding scale of Gross Margin from 12% to 30% or greater translating to a commission rate of 5% to 18% of Gross Profit Dollars.  Any business with less than 12% Gross Margin does not receive a commission.  The following table describes the Gross Margin and the corresponding Base Sales Commission Rates that will result.

| Gross Margin | Estimated Mark-Up (information only) | Base Sales Commission Rate |
|---|---|---|
| <12.0% | <30.0% | 0.0% |
| 12.0-15.9% | 30.0-36.9% | 5.0% |
| 16.0-16.9% | 37.0-38.9% | 6.0% |
| 17.0-17.9% | 39.0-39.9% | 7.0% |
| 18.0-18.9% | 40.0-41.9% | 8.0% |
| 19.0-19.9% | 42.0-43.9% | 9.0% |
| 20.0-20.9% | 44.0-45.9% | 10.0% |
| 21.0-21.9% | 46.0-47.9% | 11.0% |
| 22.0-22.9% | 48.0-49.9% | 12.0% |
| 23.0-23.9% | 50.0-50.9% | 13.0% |
| 24.0-24.9% | 51.0-52.9% | 14.0% |
| 25.0-25.9% | 52.9-54.9% | 15.0% |
| 26.0-27.9% | 55.0-59.9% | 16.0% |
| 28.0-29.9% | 60.0-64.9% | 17.0% |
| >=30% | >65.0% | 18.0% |

15

(ii)    Commission Rate Multiplier. In addition to the Base Sales Commission Rate, the Company is providing a Commission Rate Multiplier based upon Gross Profit Dollars of $300,000 or more (the "Sales Commission Rate Multiplier"). The Multiplier is a sliding scale and applies to all commissions for temporary placements where the Gross Profit Dollars are over $300,000, and can increase your Base Sales Commission Rates by 1% to 5% resulting in a Multiplied Commission Rate. The Sales Commission Rate Multiplier is determined on a per invoice basis and is always off of the Base Sales Commission Rate. The Gross Profit Dollars and the Sales Commission Rate Multiplier will be calculated on an annual calendar basis and the Gross Profit Dollars will be reset to zero each January 1st.

| Gross Profit Dollars Each Calendar Year | Multiplier on Base Sales Commission Rate for each invoice |
|---|---|
| $0-299,999 | 100% |
| $300,000 – 999,999 | 110% |
| $1,000,000 – 1,499,999 | 115% |
| $1,500,000 – 1,999,999 | 120% |
| $2,000,000 – 2,499,999 | 125% |
| $2,500,000 – 2,999,999 | 130% |
| $3,000,000 – 3,499,999 | 135% |
| $3,500,000 – 3,999,999 | 140% |
| >=$4,000,000 | 150% |

### *Example of Sales Commission Rate Multiplier*

During the week ending July 13th, your Gross Profits Dollars are $500,000 for the calendar year, the Sales Commission Rate Multiplier is therefore 110% and each Base Sales Commission Rate for that week-ending would be multiplied by 110%. Therefore a job with a 5% Base Sales Commission Rate will be multiplied by 110% and the resulting Multiplied Commission Rate for that invoice on that week-ending will be 5.5%. On the same week-ending an invoice with a 10% Base Sales Commission Rate, will be multiplied by 110% and the Multiplied Commission Rate for that invoice on that week-ending will become 11%. An invoice on the same week-ending with a 15% commission rate multiplied by 110% will generate a 16.5% Commission Rate. If later in the year, your Gross Profit Dollars exceed $2,000,000, then the Base Sales Commission Rate is multiplied by 125%, so an invoice with a Base Sales Commission Rate of 5% will result in a Multiplied Commission Rate of 6.25%.

It is important to note that the multiplier is always on the original Base Sales Commission

Rate. For example if during one week ending, a Job ABC generates an invoice resulting in a 5% Base Sales Commission Rate is eligible for a Sales Commission Rate Multiplier of 110% and later in the year the same Job ABC is eligible for a Sales Commission Rate Multiplier is 120%, the resulting Multiplied Commission Rates are 5.5% (110% times 5%) and 6% (120% times 5%) consecutively.

(iii)　**Splits.** In the event EMPLOYEE generates Gross Profit Dollars with the assistance or as a result of the introduction of either the President, the COO and/or another employee of the COMPANY or any of its Affiliates, the EMPLOYEE shall be entitled to receive a pro-rated commission Base Sales Commission Rate in proportion to assistance provided. For example, if the Gross Margin is 20% on a project, the Base Sales Commission Rate is therefore 10%, and EMPLOYEE and one other person use equal effort to generate the business then, the Base Sales Commission Rate will be split 50% and 50%, resulting in each person receiving a 5% Base Sales Commission Rate. A Multiplier on Base Sales Commission Rate for each Invoice will apply as described above.

(iv)　If the EMPLOYEE is entitled to a commission under this Section (d) with respect to a new client or job order, EMPLOYEE shall be entitled to such commission under either Subsection (d)(i) or (d)(iii), but not more than one of the foregoing Subsections. All decisions regarding (A) whether or not the EMPLOYEE is entitled to a commission with respect to a new client or job order under this Section (d), (B) whether a commission is calculated pursuant to Subsection (d)(i), (d)(ii) or (d)(iii), including, but not limited to, determining whether EMPLOYEE's assistance was integral to the COMPANY in bringing in an employer-client or obtaining a job order and (C) the commission rate pursuant to Subsection (d)(iv) shall be made by the President or COO in their sole discretion.

(v)　EMPLOYEE shall be entitled to payment of EMPLOYEE's commissions under this Subsection (d), when the Net Profits are paid to the COMPANY on a monthly basis. Notwithstanding that commissions may have been paid to the EMPLOYEE, such commissions shall not be deemed earned by the EMPLOYEE unless and until the expiration of all applicable grace periods with respect to a particular placement and the full payment to the COMPANY, and/or the factoring company, as the case may be. In the event of the termination of this Agreement, the EMPLOYEE shall remain liable to the COMPANY with respect to any unearned commission advanced to EMPLOYEE and the COMPANY may hold back any payment otherwise due to the EMPLOYEE until the expiration of such grace periods or the payment to the COMPANY or the factoring company, as the case may be.

(vi)　In no event shall the EMPLOYEE be entitled to receive any commissions on Net Profits under this Section (d) resulting from any employer-client who has given the COMPANY or any HC Affiliate a job order within the twelve (12) months prior to EMPLOYEE assisting with such client.

17

(d)     Conversion Commissions.

(i)     In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission as outlined in the Recruiter Commission Rate schedule of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies or (ii) the relevant employer-client is a Commissionable Client. The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion.    All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)     The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From a Conversion of a Commissionable Clients credited to the EMPLOYEE for placements in permanent positions in accordance with the COMPANY's policies for crediting fees provided the placement fee is at 15% or greater. The commission rate will adjusted pro-rata or at the discretion of the COPMANY in the event the placement fee is lower than 15%.

Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period. The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)     "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee. In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

(iv)     The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (f)(ii) and (iii) above.    In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

(e)     Permanent Placement Commissions.

(i)     The EMPLOYEE shall receive a commission of ten percent (10%) of the Collections From Permanent Placement Services from Commissionable Clients credited to the EMPLOYEE for placements in permanent paralegal positions in accordance with the COMPANY's policies for crediting fees.

18



(ii)     Commissions on Collections From Permanent Placement Services will not be earned or considered earned until the expiration of period of time during which, if the employment of the applicant terminates with the client who paid the fee, the COMPANY would be obligated to refund the fee or provide a credit, in whole or in part (the "Guaranty Period"). The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)    "Collections From Permanent Placement Services" shall mean, for the relevant period, fees generated and received by the COMPANY for the permanent placement of job candidates with Commissionable Clients, less any refunds, credits, fall-offs, discounts and/or other rebates given or owing to Commissionable Clients less any split fees or other payments or credits on or with respect to such fees paid or payable or owing at any time to other placement services or recruiters (which may be Affiliates of the COMPANY and shall be credited by the COMPANY and others in accordance with COMPANY's policies as in effect from time to time) and less legal fees, if any, expended to collect such receipts.

(iv)     The EMPLOYEE agrees that no commission on a particular placement shall be earned or considered earned until the completion of the conditions precedent set forth above in Subsections (d)(ii) and (iii) above.   In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned prior to the date of termination.

(v)      For purposes of clarification, the commissions referred to in this Section (c) assume that placement fees are at least fifteen percent (15%) for paralegals or at least twenty percent (20%) for attorneys of the placements first year base salary. Commission rates will be adjusted pro-rata or at the discretion of the COMPANY in the event placement fees are less than 15% for paralegals or less than 20% for attorneys.

(f)      Conversion Commissions.

(i)      In the event a temporary paralegal, attorney or legal support staff personnel of the COMPANY is hired on a permanent basis by the employer-client to whom such temporary employee was assigned (a "Conversion"), the EMPLOYEE shall receive a commission of 5% of the Conversion Fee applicable thereto, if the EMPLOYEE was solely responsible for (i) placing such temporary employee with the relevant employer-client in accordance with the COMPANY's policies, or (ii) the relevant employer-client is a Commissionable Client and (iii) the sales revenue for the temporary placement was at a thirty-five percent (35%) or greater mark-up as defined by the COMPANY. Commission rates will be adjusted pro-rata or at the discretion of the COMPANY for Sales revenue that is generated at less than a thirty-five percent (35%) mark-up. The EMPLOYEE is not entitled to a commission on any Conversion except as specified herein and in no event shall the EMPLOYEE be entitled to receive the commissions set forth under both subpart (i) and (ii) of the immediately preceding sentence on the same Conversion. All commissions on Conversions shall be paid in accordance with the COMPANY's regular practices for the payment of Commissions on Conversions.

(ii)     Commissions on Conversions will not be deemed earned until the expiration of the applicable Guaranty Period. The COMPANY reserves the right in its sole and absolute discretion to negotiate and thereafter, as it deems appropriate, modify the Guaranty Period applicable to any and all placements at any time.

(iii)   "Conversion Fees" shall mean for the relevant period fees received by the COMPANY for any temporary employee's conversion to a permanent employee with and by an employer-client less the portion of such fee paid, owing or credited to other placement services or recruiters (which may be Affiliates of the COMPANY) in accordance with split fee policies in effect between the COMPANY and such other placement services or recruiters, net of refunds, credits, fall-offs, discounts and/or other rebates and legal fees expended to collect such fee.  In the event that any fees are received by the COMPANY as a result of placement services which are earned in conjunction with any Affiliates of the COMPANY, such fees shall be credited as appropriate, in accordance with such policies of the COMPANY as may exist from time to time and be applicable to all employees and Affiliates generally.

(iv)   The EMPLOYEE agrees that no commission on a particular Conversion shall be considered earned until the completion of the conditions precedent set forth above in Subsections (e)(ii) and (iii) above.   In the event the EMPLOYEE's employment with the COMPANY is terminated for any reason whatsoever, the EMPLOYEE shall only be entitled to receive those commissions earned as of the date of termination.

(g)   **Advances.**  Notwithstanding anything herein to the contrary, the COMPANY may, in its sole and absolute discretion, advance to the EMPLOYEE all or any portion of a commission on a placement prior to the expiration of the Guaranty Period or prior to the full receipt by the COMPANY of all of the fees or other amounts due and owing to it for the placements on which such commission is based.  In such event, the COMPANY shall reduce the amount otherwise owed to the EMPLOYEE for the relevant placement by the amount of any advances made to the EMPLOYEE for such placement and shall recoup such advance or portion of such advance from any commission owed to the EMPLOYEE.  In the event a commission has been advanced to the EMPLOYEE, in whole or in part, which the EMPLOYEE is not ultimately entitled, the EMPLOYEE agrees to immediately refund in full to the COMPANY any and all such unearned advances made to the EMPLOYEE by the COMPANY.

(h)   **Changes to Compensation.**  Notwithstanding anything herein to the contrary, commission rates and other compensation set forth herein may be changed at the sole discretion of the COMPANY at any time upon written notice to the EMPLOYEE which notice and change shall be effective for all revenues received, placements made and compensation earned after such notice.

(i)   **Works In Progress.**  EMPLOYEE shall not be entitled to: (A) a commission on any work in progress, meaning on any revenues received or client approved time billed by temporary employees after the termination of the EMPLOYEE's employment, or (B) a commission on any permanent placements where the commission has not yet been earned in accordance with the terms of this Agreement at the time of termination of EMPLOYEE's employment.

**EXHIBIT B**

## MOBILE DEVICE AND NON-CORPORATE COMPUTER ADDENDUM
## TO EMPLOYMENT AGREEMENT

This Information Technology Addendum ( the "IT Addendum") defines the standards, procedures, and restrictions applicable to Employee's use of mobile devices, including, but not limited to Blackberries, iPhones, iPads, smart phones or other such mobile devices Employee may use to access Company's network or conduct business on behalf of the Company (collectively, "**Mobile Devices**") and any computers, laptops, or tablets that are not issued by the Company that Employee may use to access Company's network or conduct business on behalf of the Company (collectively "**Non-Corporate Computers**"). This IT Addendum is intended to protect Company's technology-based resources, including computer and network systems, databases and other Confidential Information (collectively, "**Technology Resources**") and Company Data (as defined below) from unauthorized use or disclosure and/or a malicious attack resulting from Employee's use of a Mobile Device or Non-Corporate Computer. "**Company Data**" means all Company information, data and databases.

The Parties agree as follows:

1.     **Responsible Use**.  Employee agrees to use Mobile Devices, Non-Corporate Computers, and Company Technology Resources appropriately, responsibly, ethically and in compliance with the Employment Agreement, Company's Information Processing Systems Policy, Employee Handbook, and the Confidentiality Agreement executed by the Parties. Employee is responsible for backing up all personal data contained on such devices.  Company is not responsible for any personal data.

2.     **Password Requirements**.  Employee shall maintain reasonable access control measures on Mobile Devices and Non-Corporate Computers, including, but not limited to, a power-on password as well as an inactivity-triggered password. Employee agrees to protect such passwords from unauthorized use and never share or disclose his/her passwords to anyone, other than as directed Company.  Passwords may not be printed, stored online and if possible, must be comprised of a combination of letters and numbers which are not in a sequence or otherwise easy to decipher.

3.     **Responsibility for Data and Voice Fees**.  The Employee acknowledges that the Employee is solely responsible for all fees for data and voice services associated with any Employee Company Device, except to the extent expressly agreed to by the Company.

4.     **Location and Disabling Requirements**.  If available, Employee shall enable features on his/her Non-Corporate Computer and Mobile Device to enable Employee and/or the Company to locate lost or stolen equipment and/or to remotely disable such devices and/or disable access to any Company Data. If Employee needs assistance enabling such features, Company's IT Department will provide such assistance.

5. **Anti-Virus Requirements**. Any Non-Corporate Computers used by Employee to synchronize with Employee's Mobile Device must utilize prevailing industry standard antivirus software and vice-versa. The Company further recommends use of prevailing industry standard antivirus applications for any Mobile Devices and Non-Corporate Computers. Please contact the Company's IT Department to the extent you have any questions regarding recommendations.

6. **Registration with Company**. Employee shall make known to the Company which Mobile Devices and Non-Corporate Computers Employee will be using in conjunction with Company Technology Resources. If applicable, Company's IT department may register, configure, and set-up Employee's Mobile Devices and Non-Corporate Computers.

7. **Use Restrictions**. Employee shall not:

   a. make any modifications of any kind to software, if any, installed by Company on a Mobile Device or Non-Corporate Computer;

   b. use any Company Technology Resources to load any pirated software or illegal content on to any Mobile Device or Non-Corporate Computer;

   c. use a Mobile Device or Non-Corporate Computer to make unauthorized disclosure of Company Data; or

   d. use a Mobile Device or Non-Corporate Computer to violate or attempt to violate any local, state, federal or international law.

   e. use Company Technology Resources for any purpose other than Company business purposes.

8. **Segregation of Company Email From Personal Communications**. Employee agrees to be cautious about the merging of personal and work email accounts, calendars, task lists or other applications on a Mobile Device or Non-Corporate Computer. Employee will take particular care to ensure that Company Data is only sent through the Company's email system and is segregated from personal data.

9. **Downloading/Storage of Company Data to Mobile Devices or Non-Corporate Computer; Remote Access of Company Files and Systems**. Company Data may not be downloaded to a Mobile Device or Non-Corporate Computer for any non-work related purposes. The storage of such data could compromise the confidentiality of such Company Data and therefore is not permitted. For example, Employee may not save and store email attachments for access locally on a Mobile Device or Non-Corporate Computer but shall instead access such documents via the Company email system or other Company Technology Resources. Notwithstanding the foregoing, Employees may only access the Company's computer files, systems and other Technology Resources upon the prior written consent of the Officer of the Company and on such terms and conditions as set forth by the Officer.

22

10. **Reporting Lost or Stolen Devices or Other Incidents**. Employee shall immediately report to his/her supervisor and Company's IT Department: (a) any lost or stolen Mobile Device or Non-Corporate Computer or (b) any incident or suspected incident of unauthorized access of Company's networks and/or unauthorized disclosure of Company Data. Employee agrees to reasonably cooperate with Company to protect any Company Data and/or remedy any incident.

11. **Company Right to Monitor; No Expectation of Privacy**. Employee agrees and acknowledges that, except as prohibited by law, Company may (but is not obligated to) monitor, record, and review Employee's communications in connection with Company Technology Resources, including access to Company's networks and resources, including, without limitation, the dates, times, and duration of Employee's access to the Company's network. Employee acknowledges that he/she shall have no expectation of privacy in anything that he/she creates, stores, sends or receives on or through the Company Technology Resources by use of any Mobile Device or Non-Corporate Computer. Company does not anticipate monitoring its Technology Resources absent a legitimate business purpose, including, e.g., investigating possible theft or espionage, monitoring work flow, retrieving missing Company Data, evaluating compliance with Company policies, and so forth.

12. **Confidentiality of Company Data**. The Parties agree and acknowledge all Company Data accessed or stored on the Employee's Mobile Device or Non-Corporate Computer shall be deemed to be Company Confidential Information for the purposes of the Employment Agreement and Confidentiality Agreement.

13. **Deletion of Company Data Upon Termination of Employment**. Upon the earlier of Company's request or Employee's termination of employment with Company, Employee shall provide Company with access to Employee's Mobile Device or Non-Corporate Computer in order to allow Company to delete or otherwise remove Company Data from Employee's Mobile Device or Non-Corporate Computer.

14. **Compliance with Applicable Laws**. All Employees must comply with all applicable software licenses, copyrights, and other national/federal, state and international laws and regulations governing intellectual property, online activities, and data protection.

15. Disclaimer of Liability. COMPANY ASSUMES NO LIABILITY FOR LOSS, DAMAGE, DESTRUCTION, ALTERATION, DISCLOSURE, OR MISUSE OF ANY PERSONAL DATA OR COMMUNICATIONS TRANSMITTED OVER OR STORED ON A MOBILE DEVICE OR NON-CORPORATE COMPUTER. COMPANY ACCEPTS NO RESPONSIBILITY OR LIABILITY FOR THE LOSS OR NON-DELIVERY OF ANY PERSONAL ELECTRONIC MAIL OR VOICEMAIL COMMUNICATIONS OR ANY PERSONAL DATA STORED ON ANY MOBILE DEVICE OR NON-CORPORATE COMPUTER. EMPLOYEE EXPRESSLY ACKNOWLEDGES AND AGREES TO RELEASE COMPANY FROM ANY AND ALL CLAIMS, INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S ACCESS TO EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS,

23

**INJURIES, LOSSES, DAMAGES OR EXPENSES ARISING FROM COMPANY'S DELETION OF EMPLOYEE'S PERSONAL DATA OR INFORMATION ON EMPLOYEE'S MOBILE DEVICE OR NON-CORPORATE COMPUTER.**

16. **Penalty for Violations**. The Parties agree and acknowledge that Employee's violation of the terms of this IT Addendum may result in disciplinary action, including but not limited to termination of employment.

17. **Entirety**. This IT Addendum, together with the Employment Agreement, Company's Information Processing Systems Policy, Employee Handbook and the Confidentiality Agreement executed by the Employee represents the entire agreement between the parties with respect to the subject matter hereof.

24